PAUL D. MARTYR AND CRISTA L. MARTYR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Martyr v. Commissioner
Docket Nos. 39485-86, 41299-86, 41300-86
United States Tax Court
T.C. Memo 1990-558; 1990 Tax Ct. Memo LEXIS 630; 60 T.C.M. (CCH) 1115; T.C.M. (RIA) 90558; October 25, 1990, Filed *630 Decisions will be entered under Rule 155. Dennis R. DiRicco[2] and Katherine D. Ray, for the petitioners. Robert W. Towler, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined that petitioners in these consolidated cases were liable for the following income tax deficiencies, additions to tax, and additional interest: Additions
Under
Sections
Docket No.
Petitioner
Year
Deficiency
[3] 6653(a) 39485-86
Paul D. Martyr and
Crista L. Martyr
1980
$ 67,007
1981
14,292  41299-86
Michael Gatto
1980
5,051   $ 253
1981
1,983   1982
11,890  41300-86
Philip A. Gatto and
Stephanie Gatto
1980
12,516  626  1981
2,383   1982
11,477  Additions Under Sections
Docket No.
Petitioner
6653(a)(1)
6653(a)(2)
6621(c)
6661
39485-86
Paul D. Martyr and
Crista L. Martyr
* *631 *
41299-86
Michael Gatto
*
$ 99 **
*
595  **
*
$ 1,189
41300-86
Philip A. Gatto and
Stephanie Gatto
*
119  **
*
574  **
*
1,148  Respondent conceded the additions to tax except the additional interest under section 6621(c). Certain other concessions are set forth in the stipulations of fact submitted in the case of Paul D. Martyr and Crista L. Martyr (the Martyrs) and in the parties' briefs. The cases before us present issues related to six research and development partnerships for the years indicated: Partnership
Years
Computech Research Investors, Ltd. (CRI)
1980
Blueprint Software (BS)
1982
Quoin Software (Quoin)
1982
Mass Data Storage (MDS)
1980
Technology Research Investors (TRI)
1981
Polymer Scientific (PS)
1980, 1981 The Martyrs were partners in CRI, MDS, and TRI. Michael Gatto, and Philip A. Gatto and Stephanie Gatto were partners in BS, Quoin, and PS. BS, Quoin, and CRI were also the subject of the Court's opinion in Alexander v. Commissioner, T.C. Memo. 1990-141. The third issue in that case was whether the payees of promissory notes made by BS, Quoin, *632 and two other partnerships held interests in the activities being financed, other than interests as creditors, within the meaning of section 465(b)(3)(A). We held that they did. Accordingly, those taxpayers who were limited partners were not at risk with respect to the portion of the bases of their partnership interests attributable to the notes. To the extent that the taxpayers as limited partners were not at risk, their distributive shares of partnership losses were not deductible. On April 18, 1990, respondent moved for reconsideration of our opinion in Alexander v. Commissioner, T.C. Memo. 1990-141, calling into question whether section 465(b)(3)(A) applied to the activities of the partnerships. We held that the partnerships' activities were "other activities" falling within the ambit of section 465(c)(3)(A) and not section 465(c)(1). Alexander v. Commissioner, 95 T.C. (1990). Section 465(c)(3)(D) [4] unambiguously provides that section 465(b)(3) "shall apply only to the extent provided in regulations prescribed by the Secretary," to an activity described in section 465(c)(3)(A). To date, regulations have not been finalized by the Secretary. Accordingly, we held that section *633 465(b)(3) did not apply to the activities of the limited partnerships. Alexander v. Commissioner, 95 T.C. (1990). In the present case, respondent tried and briefed the same at-risk issue raised in Alexander. On May 2, 1990, respondent informed the Court that arguments contained in the motion for reconsideration in Alexander are equally pertinent to this case. We treat this statement by respondent as a concession to be bound in the present case by our disposition of his motion for reconsideration in Alexander. Due to our disposition of such motion, we need not consider the at-risk issue originally raised by respondent in this case. See Alexander v. Commissioner , 95 T.C. (1990). After concessions, the following issues remain for decision: (1) Whether certain expenditures by each of the partnerships were paid or incurred in connection with a trade or business, within the meaning of section 174. [5] *634 (2) Whether petitioners have proven that they are entitled to deduct their distributive shares of the following partnership items: (a) Legal expenses of $ 15,000 and salaries of $ 8,500 by CRI; [6] (b) legal expenses of $ 16,000 and $ 8,000 by MDS and TRI, respectively; and (c) organizational expenses of $ 1,600 and $ 3,000 by BS and Quoin, respectively. (3) Whether and to what extent there were substantial underpayments attributable to tax motivated transactions, as defined in section 6621(c). [7] *635 On May 2, 1990, respondent informed the Court that "statements in his Motion for Reconsideration in Alexander also should be considered in relation to his arguments on interest under I.R.C. § 6621(c) in the subject cases." (4) The last issue is unrelated to the above issues which stem from partnership items. Michael Gatto deducted "interest" paid on promissory notes he had issued to a trust he had established for the benefit of his niece and nephew. We must decide whether he is entitled to deduct the payments as interest expense, under section 163. [8]
For convenience and clarity, we will discuss our Findings of Fact and Opinion by issue. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of fact and related exhibits are incorporated herein by this reference. All petitioners resided in California at the time their petitions were filed with the Court. I. Trade Or Business Under Section 174
FINDINGS OF FACT A. Computech Research Investors, Ltd. (CRI)
Messrs. Brian B. Lewis and William R. Rapoport were attorneys at law and partners in the law firm of Rapoport and Lewis, with offices in Burlingame, California. On July 10, 1980, Computech *636 Investments, Inc. (CI), was incorporated under California law. CI was formed for the stated purpose of acting as general partner of CRI and other computer research and development ventures, and to provide consulting advice to the general business community regarding the ventures. Messrs. Lewis and Rapoport each owned 50 percent of CI's outstanding stock, and were its two directors. Mr. Lewis was the president and Mr. Rapoport was the secretary of CI. CI's principal place of business was at the law offices of Rapoport and Lewis in Burlingame, California. Also on July 10, 1980, Business Systems Technology, Inc. (BST), was incorporated under California law. BST was formed for the stated purpose of performing technological research and development activities. All of BST's outstanding stock was owned by Mr. Terry Marsh. BST's office was at the law offices of Rapoport and Lewis for its first eight or nine months of existence. On February 21, 1980, United Computech, Inc., was incorporated under California law, and later amended its articles of incorporation in order to use the name of Western Business Computers, Inc. (Western). Western was founded by Terry Marsh as its president *637 for the purpose of marketing, selling, and distributing developed technology. Mr. Marsh originally owned all of Western's outstanding stock, but in 1981 his ownership interest dropped to 78 percent of the outstanding stock. On July 22, 1980, CRI was formed as a limited partnership under California law. The purpose of CRI, as stated in its partnership agreement, was "the development of computer products and the sale and/or licensing of its rights to same to a third party company or companies, and the Partnership may engage in any and all activities permitted by law that are related or incidental thereto." The sole general partner of CRI was CI, and Mr. Lewis was the initial limited partner. Additional limited partnership interests were later issued through a private placement to a number of investors, including the Martyrs. CRI's principal place of business was also at the law offices of Rapoport and Lewis in Burlingame, California. The law firm of Rapoport and Lewis served as legal counsel to CI, BST, Western, CRI, and Terry Marsh. The law firm obtained the assistance of another firm in structuring the transaction and in preparing the tax opinion letter related thereto. The law *638 firm was fired by Terry Marsh, BST, and Western in the latter part of 1981. Messrs. Lewis and Rapoport had no significant prior experience in the computer industry before forming CI and CRI. The private placement memorandum for CRI states, however, that arrangements were made "to engage Robert D. Widergren as the representative of the Partnership [CRI] to assist the Partnership in developing the specifications for the development program and then to assist in monitoring the development program on behalf of the Partnership." Mr. Widergren had over 17 years of prior experience as an administrator, inventor, and engineer in the electronics area. While Mr. Widergren may have been involved in determining whether technology could be developed, he actually performed no role in monitoring development. By the time Terry Marsh had founded BST and Western in 1980, he had been actively involved in the marketing of small business computer systems for 15 years. He had previously worked as vice president of sales at the Quantel Corporation, national sales manager at the Microdata Corporation, and had served in various managerial positions at the Singer Corporation. Mr. Marsh was credited with *639 having established nationwide sales networks of independent distributors at Singer and Microdata, and a worldwide network at Quantel. He had also established business relationships with various reputable computer software developers. In addition to Mr. Marsh, the management of BST included Ronald Wu as director of software development. Mr. Wu previously had his own consulting business and worked in technical positions at the Honeywell and General Automation Corporations. At Western, Mr. Marsh was joined by Paul Decker and Lee Adams as vice presidents. Messrs. Decker and Adams had previously served under Mr. Marsh as regional sales managers at the Quantel Corporation. During the 1970's, significant technological advances took place in the computer industry, including the advent of the "minicomputer." These advances reduced the cost of computing power and opened up the small business computer market. Large computer companies such as the Honeywell Corporation sought to penetrate the small business market. To do so, however, Honeywell needed to devise ways to operate existing small business applications software on Honeywell hardware. CRI, CI, BST, and Western served the respective *640 roles of financing, managing (as general partner of CRI), developing, and marketing software aimed at meeting Honeywell's needs. The particular software to be developed included a prototype compiler and certain application programs. The purpose of the prototype compiler was to render Honeywell's software operating system compatible with certain existing software in the small business market. Honeywell entered into an original equipment manufacturer's contract with Western to market Honeywell products. Western also agreed to license Honeywell's operating system in return for a royalty. Honeywell supplied Western with over $ 200,000 in hardware to facilitate the research project. CRI entered into a management fee agreement with CI, an R & D agreement with BST, and a transfer of technology agreement with Western. Under the management fee agreement, CI received an annual management fee of $ 25,000 for 1980, $ 18,000 for 1981, and a fee of $ 1,500 per month thereafter. Under the R & D agreement, BST agreed to undertake research and development of the prototype software on behalf of CRI in return for $ 1.4 million. It was agreed that any technology developed by BST was the sole and *641 exclusive property of CRI. The $ 1.4 million agreement price was payable to BST as follows: (1) $ 550,000 upon execution of the agreement by cashier's or certified check; and (2) $ 850,000 by a noninterest-bearing, recourse promissory note, due and payable on or before January 1, 1989. CRI agreed to pay the note to BST on the basis of 17 percent of royalties received by CRI attributable to the developed software. Under the transfer of technology agreement, CRI granted to Western a nonexclusive license to review for a 13-month period all technology developed under CRI's R & D agreement with BST. Prior to and during the review period, CRI agreed not to do anything that would jeopardize the pending exclusive rights of Western to the technology. Upon the payment of $ 10,000 to CRI, Western would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, Western agreed to pay CRI a royalty. The royalty was equal to 1.5 percent of Western's annual gross sales of all products using the transferred technology until aggregate *642 royalties reached $ 1.55 million and, thereafter, 1.25 percent of sales until aggregate royalties reached $ 5.05 million. Upon reaching aggregate royalties of $ 5.05 million, further royalties would cease and Western would retain all right, title, and interest to the technology. Approximately 45 to 60 systems utilizing the developed technology were installed, yielding between $ 60,000 to $ 100,000 of royalties to CRI from Western, none of which was actually paid. CRI reported an R & D deduction of $ 1.4 million for the year 1980. CRI reported total income and deductions on Form 1065, as amended, as follows: Year
Income
Deductions
Operating loss
1980
0
$ 1,425,417
$ 1,425,417  1981
0
31,567
31,567  1982
$ 10,000
12,225
2,225  1983
390
14,803
14,413  1984
3
10,017
10,014  1985
270
7,922
7,652  B. Blueprint Software (BS)
Mr. Dennis DiRicco was an attorney practicing law in San Mateo, California. He entered the private practice of law in 1979 after working for some years as a revenue agent, district conferee, and appellate conferee for the Internal Revenue Service. On August 15, 1981, BS was formed as a limited partnership under California law and would remain in existence under its certificate of limited *643 partnership until December 31, 2006, unless sooner terminated upon the occurrence of certain specified events. The purpose of BS, as stated in the certificate of limited partnership, was "to engage in the general business of Research and Development of Computer Software and the sale and/or licensing of its rights of same to a third party company or companies." The general partner of BS was Mr. DiRicco, and limited partnership interests were issued to a number of investors, including petitioner Michael Gatto and petitioners Philip A. and Stephanie Gatto. BS's principal place of business was at Mr. DiRicco's law office in San Mateo, California. Robert Garzee was majority shareholder and an officer of Management Blueprint Software, Inc. (MBS), and Synergistic Management Group, Inc. (SMG). Mr. Garzee was a consultant and international expert on the use of computers by nontechnical users. MBS, a California corporation, was engaged in the process of developing the technology and methodology that will enhance the usage of microprocessors in various business applications. SMG, also a California corporation, specialized in the marketing of computer technology. Mr. DiRicco served as legal *644 counsel to BS, MBS, SMG, and Robert Garzee. BS, Mr. DiRicco, MBS, and SMG served the respective roles of financing, managing (as general partner of BS), developing, and marketing the software. Their collective objective was to develop and market microcomputer software for use as a management tool by nontechnical users. To accomplish this objective, in 1981 BS entered into an R & D agreement with MBS and a transfer of technology agreement with SMG. Under the R & D agreement, MBS agreed to undertake the research program on behalf of BS in return for $ 600,000. It was agreed that any technology developed by MBS under the agreement was the sole and exclusive property of BS. The $ 600,000 agreement price was payable by BS to MBS as follows: (1) $ 300,000 upon execution of the agreement by cashier's check or certified check; and (2) $ 300,000 by a noninterest-bearing, full recourse promissory note, due January 1, 1990. In 1982, BS agreed to provide MBS with an additional $ 103,250 as further compensation for the research and development services, half of which was paid in cash and the balance by promissory note dated December 1, 1982. The note was noninterest-bearing in the principal *645 sum of $ 51,625, to be paid in full on January 1, 1990. Under the transfer of technology agreement, BS granted to SMG a nonexclusive license to review for a 13-month period all technology developed under BS's R & D agreement with MBS. Prior to and during the review period, BS agreed not to do anything that would jeopardize the pending exclusive rights of SMG to the technology. Upon the payment of $ 200 to BS, SMG would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, SMG agreed to pay BS and MBS royalties equal to 30 percent and 70 percent, respectively, of SMG's net profits from all products utilizing the technology developed under the R & D agreement. The royalties were payable on a quarterly basis and would continue for the 10-year period following the date of the first payment of royalties from a particular product. BS's private placement memorandum estimated a net profit return on initial products utilizing the developed technology of between $ 2,579,000 and $ 5,970,000, 30 percent of which would be *646 BS's royalty. BS reported an R & D deduction of $ 103,250 for the year 1982. BS actually reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1981
0
$ 592,533
$ 592,533  1982
$ 123  104,850
104,727  1983
1,053
2,653
1,600  1984
0
1,600
1,600  1985
0
1,986
1,986  C. Quoin Software (Quoin)
On May 1, 1982, Quoin was formed as a limited partnership under California law and would remain in existence under its certificate of limited partnership until January 1, 1991, unless sooner terminated upon the occurrence of certain specified events. The purpose of Quoin, as stated in its certificate of limited partnership, was to "engage in the general business of the research and development of serial dot matrix impact printers for the small business computer system and such other activity or activities as are related or incidental thereto and as may be agreed upon from time to time by the Partners." The general partner of Quoin was Dennis DiRicco, and limited partnership interests were issued a number of investors, including petitioner Michael Gatto and petitioners Philip A. and Stephanie Gatto. Quoin's principal place of business was at Mr. DiRicco's law office in *647 San Mateo, California. Computer Systems Development, Inc. (CSD), a California corporation, specialized in the research design, development, and sale of software, as well as the design and sale of computer systems for a wide variety of business applications. The Language Company, Inc. (TLC), also a California corporation, was a wholly-owned subsidiary of CSD, specializing in the research, development, and sale of designated computer systems. On April 14, 1982, CSD (the predecessor in interest of TLC) contracted with SMC Systems and Technology, Inc. (SMC), for a nonexclusive license to use and modify the SMC Basic Software owned by SMC, with the results thereof to be owned jointly by CSD and SMC. Later in 1982, Quoin entered into an R & D agreement with CSD and TLC, and a transfer of technology agreement with TLC. Their collective objective was to develop a "translator" that would allow Basic-4 (a major computer supplier) software to be used on Digital Equipment Corporation computers and compatibles. Under the R & D agreement, CSD and TLC agreed to undertake the research program on behalf of Quoin in return for $ 400,000. Any technology developed under the agreement was to be the *648 sole joint property of Quoin and CSD/TLC. Any rights Quoin might acquire to the technology were subject to the licensing agreement between CSD and SMC. The $ 400,000 agreement price was payable by Quoin as follows: (1) $ 200,000 upon execution of the agreement by cashier's check or certified check made payable to CSD; and (2) $ 200,000 by a noninterest-bearing, full recourse promissory note, due January 1, 1991. On May 1, 1982, Quoin issued the promissory note to CSD/TLC. Under the transfer of technology agreement, Quoin granted to TLC a nonexclusive license to review for a 13-month period all technology developed under the R & D agreement. Prior to and during the review period, Quoin agreed not to do anything that would jeopardize the pending exclusive rights of TLC to the technology. Upon the payment of $ 200 to Quoin, TLC would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, TLC agreed to pay Quoin, for six years, royalties equal to 40 percent of TLC's net profits from all products utilizing the technology *649 developed under the R & D agreement. Oddly enough, TLC also agreed to pay itself a royalty equal to an "agreed to percentage" of TLC's net profits from all products utilizing the technology. Quoin reported an R & D deduction of $ 385,000 for the year 1982. Quoin also reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1982
$ 2,672
$ 388,000
$ 385,328  1983
8
4,321
4,313  1984
0
3,000
3,000  1985
0
4,359
4,359  D. Mass Data Storage (MDS)
In 1980, MDS was formed as a limited partnership under California law. The purpose of MDS, as stated in its certificate of limited partnership, was "the development of computer products and the sale and/or licensing of its rights to same to a third party company or companies." MDS had no employees. Petitioners Paul D. and Crista L. Martyr acquired a limited partnership interest in MDS. In 1980, Electronic Research Investors, Inc. (ERI), was incorporated under California law. ERI was formed for the stated purposes of acting as general partner of MDS and other computer research and development ventures, and to provide consulting advice to the general business community regarding the ventures. Messrs. Brian B. Lewis *650 and William R. Rapoport were attorneys at law and partners in law firm of Rapoport and Lewis, with offices in Burlingame, California. Mr. Lewis was director and president of ERI and owned all of its outstanding stock. Mr. Rapoport was ERI's other director and also served as its secretary. ERI's principal place of business was at the law offices of Rapoport and Lewis. Also in 1980, Practical Data Systems, Inc. (PDS), The Wollongong Group, Inc. (TWG), and Hemisphere Research, Inc. (Hemisphere), were all incorporated under California law. Hemisphere, Mr. Lewis, and certain other employees and consultants of TWG owned 86 percent, 3.75 percent, and 10.25 percent, respectively, of TWG. As of May 23, 1980, the stock ownership in both PDS and Hemisphere was as follows: Stockholder
Ownership Percentage
Noel Kile
43.75
Bruce Chancellor
43.75
Thomas Wooten
4.00 Matthew McNeiley
1.00 Brian Lewis
3.75 William Rapoport
3.75 Shortly thereafter, Bruce Chancellor transferred his stock to Noel Kile. Noel Kile and Bruce Chancellor served as president and vice president , respectively, of PDS. Messrs. Kile and Chancellor had each accumulated extensive experience in the data processing industry before assuming *651 their positions at PDS. A Frank Zehna served as president of TWG. Mr. Zehna and his staff had extensive experience in the marketing and sales aspects of the computer industry. The law firm of Rapoport and Lewis served as legal counsel to MDS, ERI, PDS, and TWG. MDS, ERI, PDS, and TWG served the respective roles of financing, managing (as general partner of MDS), developing, and marketing certain software technology. Their collective objective was to develop and market a prototype peripheral data processing subsystem for mass data storage. To accomplish this objective, MDS entered into an R & D agreement with PDS and a transfer of technology agreement with TWG. Under the R & D agreement, PDS agreed to undertake the research program on behalf of MDS in return for $ 825,000. It was agreed that any technology developed by PDS under the agreement was the sole and exclusive property of MDS. The $ 825,000 was payable by MDS to PDS as follows: (1) $ 127,500 upon execution of the agreement, by cashier's or certified check; (2) $ 127,500 within 30 days of the execution of the agreement, by cashier's or certified check; and (3) $ 570,000 by a noninterest-bearing, full recourse promissory *652 note, due January 1, 1990. Under the transfer of technology agreement, MDS granted to TWG a nonexclusive license to review for a 13-month period all technology developed under MDS's R & D agreement with PDS. Prior to and during the review period, MDS agreed not to do anything that would jeopardize the pending exclusive rights of TWG to the technology. Upon the payment of $ 5,000 to MDS, TWG would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, TWG agreed to pay MDS a royalty. The royalty was equal to 5 percent of TWG's gross sales of all products using the transferred technology until aggregate royalties reached $ 2,220,000. Upon reaching aggregate royalties of $ 2,220,000, further royalties would cease and TWG would retain all right , title, and interest to the technology. MDS reported an R & D deduction of $ 825,000 for the year 1980. MDS also reported total income and deductions on Form 1065 as follows: Year
Incomea
Deductions
Operating loss
1980
$ 0
$ 843,148
$ 843,148  1981
0
2,466
2,466  1982
0
2,063
2,063  1983
0
2,993
2,993  1984
0
403
403  1985
0
267
267  1986
0
0
0  E. *653 Technology Research Investors (TRI)
On November 18, 1980, TRI was formed as a limited partnership under California law. The purpose of TRI, as stated in its certificate of limited partnership, was "the development of computer products and the sale and/or licensing of its rights to same to a third party company or companies." ERI was the corporate general partner of TRI (and also of MDS, as discussed above). Petitioners Paul D. and Crista L. Martyr acquired a limited partnership interest in TRI. The law firm of Rapoport and Lewis served as legal counsel to ERI, PDS, and TWG (as in the case of MDS, discussed above), as well as for TRI. On December 31, 1981, TRI entered into an R & D agreement with PDS and a transfer of technology agreement with TWG (as in the case of MDS, discussed above). Their collective objective was to develop and market a prototype minicomputer-based data processing system (having a 16-bit or greater word length) compatible with the UNIX System developed by Bell Telephone Laboratories . TRI, ERI, PDS, and TWG served the respective roles of financing, managing (as general partner of TRI), developing, and marketing the software. Under the R & D agreement, PDS *654 agreed to undertake the research program on behalf of TRI in return for $ 786,000. It was agreed that any technology developed by PDS under the agreement was the sole and exclusive property of TRI. The $ 786,000 was payable by TRI to PDS as follows: (1) $ 281,650 upon execution of the agreement, by cashier's or certified check; and (2) $ 504,350 by a noninterest-bearing, full recourse promissory note due and payable on or before January 1, 1993. TRI promised to pay PDS 21 percent of royalties received from the sale of products utilizing the technology developed under the R & D agreement until the note was satisfied. On October 26, 1982, the R & D agreement was amended. The contract price was changed from $ 786,000 to $ 659,252, which was payable by TRI to PDS as follows: (1) $ 229,150 upon execution of the agreement, by cashier's or certified check; and (2) $ 430,102 by a noninterest-bearing, full recourse note due and payable on or before January 1, 1993. PDS returned $ 52,500 in cash to TRI ($ 281,650 minus $ 229,150), and the original $ 504,350 note was replaced with the $ 430,102 note. Further, the agreed upon completion time of the research program was extended. Under the *655 transfer of technology agreement, TRI granted to TWG a nonexclusive license to review for a 13-month period all technology developed under TRI's R & D agreement with PDS. Prior to and during the review period, TRI agreed not to do anything that would jeopardize the pending exclusive rights of TWG to the technology. Upon the payment of $ 5,000 to TRI, TWG would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, TWG agreed to pay TRI a royalty. The royalty was equal to 5 percent of TWG's gross sales of all products using the transferred technology until aggregate royalties reached $ 2,489,000. Upon reaching aggregate royalties of $ 2,489,000, further royalties would cease and TWG would retain all right, title, and interest to the technology. On October 26, 1982, the transfer of technology agreement was amended. The amount of the aggregate royalties was reduced from $ 2,489,000 to $ 2,080,102 in consideration for TWG's release of any cause of action it had or might have against TRI for its failure to provide *656 TWG with release reports in a timely manner, as required under the original transfer of technology agreement. On September 12, 1983, the transfer of technology agreement was again amended. The amendment extended the exercise date for any option acquired by TWG in consideration for making the $ 5,000 option payment nonrefundable. TRI reported an R & D deduction of $ 786,000 for the year 1981. TRI also reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1981
0
$ 794,000
$ 794,000 1982
* $ 60,822
4,899
(55,923)
1983
5,069
14,420
9,351 1984
9
5,933
5,924 1985
0 3,811
3,811 1986
0
6,201
6,201 F. Polymer Scientific (PS)
In 1980, PS was formed as a general partnership under California law. Dennis DiRicco organized PS and served as a general partner. Petitioner Michael Gatto and petitioners Philip A. and Stephanie M. Gatto were also general partners in PS. The purpose of PS, as stated in its general partnership agreement, was to engage in the business of research and development, and any other related business as may be agreed upon by the partners. PS never had any employees, and *657 its principal place of business was at Mr. DiRicco's law office. Also in 1980, Polymer Scientific, Inc. (PSI), was incorporated under California law. Originally, the shareholders and officers of PSI were Dennis DiRicco, John Lang, and Randy McDonald. Subsequently, Gerald Treadway, Brian Carr, and Quantum Labs (a corporation) became shareholders. Messrs. Treadway and Carr were successful chemists who had invented an adhesive coating used to bond highway reflectors to highway surfaces. On December 15, 1980, PS entered into an R & D agreement with PSI. Under this agreement, PSI agreed to undertake a research program on behalf of PS in return for $ 200,000. The research program involved the development of a scratch-resistant coating (and the process of applying the coating) to "CR39 lenses" and other plastic products. Sometime after the agreement was executed, $ 185,000 was paid by, or on behalf of, PS to PSI. It was agreed that any technology developed by PSI under the agreement was the sole and exclusive property of PS. Also on December 15, 1980, PS entered into a transfer of technology agreement with PSI. Under this agreement, PS granted to PSI a nonexclusive license to review *658 all technology developed under their R & D agreement. Prior to and during the review period, PS agreed not to do anything that would jeopardize the pending exclusive rights of PSI to the technology. Upon the payment of $ 10,000 to PS, PSI would be granted an option to acquire an exclusive, worldwide license to utilize the technology. The option was exercisable during the 90-day period following the receipt of release reports by PSI. Upon exercise of the option, PSI agreed to pay PS a royalty, on a quarterly basis, equal to one percent of the net profits of PSI for every $ 10,000 advanced by PS to PSI (or a royalty equal to 20 percent of net profits, based upon $ 200,000 to be advanced under the R & D agreement). In March 1983, Messrs. Treadway and Carr obtained a patent for the coating developed under the R & D agreement. PS reported R & D deductions of $ 185,000 for the year 1980, but no deduction for the year 1981. PS reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1980
0
$ 185,000
$ 185,000 1981
0
0
0 1982
0
0
0 1983
0
0
0 1984
0
0
0 1985
0
0
0 1986
0
0
0 OPINION The operative facts as we find them governing the deductibility of research or experimental *659 expenditures by the six partnerships before us are so similar that we will consider them together. Petitioners bear the burden of proving that they are entitled to the deductions. See Rule 142(a). Section 174(a)(1) provides generally that: A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to [a] capital account. The expenditures so treated shall be allowed as a deduction.
In Snow v. Commissioner, 416 U.S. 500 (1974), the Supreme Court established that a taxpayer need not currently be producing or selling a product in order to obtain a deduction under section 174. The Supreme Court compared section 174 with section 162 stating that: Congress wrote into section 174(a)(1) "in connection with," and section 162(a) is more narrowly written than in section 174, allowing "a deduction" of "ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business." * * * [416 U.S. at 503.]
This "interpretation of section 174(a)(1) fairly invited the creation of R & D tax shelters, and the bar quickly took up the invitation." Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), *660 affg. T.C. Memo. 1986-403. Ten years after Snow, this Court observed in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), that: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [Emphasis in original.]
The grant of an exclusive license to exploit technology prior to commencement of research or experimentation effectively precludes a licensor from ever surpassing investor status by engaging in a trade or business with respect to the technology. Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Levin v. Commissioner, 87 T.C. 698, 726-727 (1986), affd. 832 F.2d 403 (7th Cir. 1987). In all of the cases, the transfer of technology and R & D agreements included direct references to each other and were entered into at about the same times. However, the transfer of technology agreements did not provide for the immediate grant of exclusive licenses, but rather the grant of non-exclusive review *661 licenses coupled with options to acquire the technology developed under the R & D agreements. Therefore, the possibility existed under the transfer of technology agreements that the licensees would not exercise the options and the limited partnerships would thus not be precluded from ever engaging in trades or businesses. This Court recently faced the issue of the treatment of an option to acquire a license to technology in Diamond v. Commissioner, 92 T.C. 423 (1989). In Diamond, the Commissioner argued that there was either an immediate sale or exchange of all rights or the grant of an exclusive license to the subject technology. The taxpayer contended that there was merely an option to acquire a license, and since there was a possibility that the optionee would not exercise its right, the door was open for the taxpayer or the partnership to exploit the results of the research. Unlike Diamond, it is clear in this case that options to acquire exclusive licenses are present. In Diamond, however, we held that even if the subject provision constituted an option, "there is no realistic prospect that the [technology] would ever be exploited in any trade or business carried on by any one *662 other than [the would-be licensee]." 92 T.C. at 439. In so holding, we adopted the reasoning of the Seventh Circuit in Spellman v. Commissioner, supra.
In Spellman, the Circuit Court provided the following discussion regarding Sci-Med (the limited partnership) and Teva (the research and marketing company): Teva's option to acquire for only $ 20,000 all rights in the byproducts will prevent Sci-Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than $ 20,000, Teva will exercise the option and Sci-Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci-Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. * * * [845 F.2d at 151.]
The transfer of technology agreements entered into by CRI, BS, Quoin, MDS, TRI, and PS provided that options to acquire exclusive licenses to all technology developed under the R & D agreements could be obtained upon the payment of $ 10,000, $ 200, $ 200, $ 5,000, $ 5,000, and $ 10,000, respectively. Sound business judgment dictates that the optionees *663 would surely exercise the options if anticipated profits from the exploitation of the technology exceeded the option prices, and would decline to exercise the options if anticipated profits were less than the option prices. Given the nominal cost of the options to acquire the exclusive licenses, the partnerships were "prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics." Diamond v. Commissioner, 92 T.C. at 441. Accordingly, we find that there was "no realistic prospect" that the developed technology would ever be exploited by anyone other than the optionees. See Diamond v. Commissioner, 92 T.C. at 439. We have considered the remote possibility that the each of the six partnerships could profitably exploit the technology while the optionees could not. In such a case, the optionees' failure to exercise their options would leave the door open for the partnerships to engage in trades or businesses through the exploitation of the developed technology. The evidence clearly shows, however, that the partnerships (through their general partners) never intended, nor were capable of, engaging in trades or businesses with respect *664 to the software technology. Stated otherwise, the partnerships never intended to, nor ever did, go beyond the role of mere investors. The management of investments is not a trade or business irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner, 312 U.S. 212 (1941). The R & D agreements, transfer of technology agreements, and other documents entered into by the six partnerships make crystal clear that their intent was to sit back and have others develop and ultimately market the technology in return for royalties. Nevertheless, petitioners presented evidence to show that the general partners of the partnerships were actively involved in the development and marketing of the technology. None of the general partners, however, had any significant training or experience in the technological or marketing aspects of computer software (or chemicals in the case of PS). Any involvement by the general partners was either insignificant or was directed at investment management. We also reject the suggestion by petitioners that the partnerships may have been in the trade or business of exploiting inventions through *665 regular licenses and sales. See Avery v. Commissioner, 47 B.T.A. 538 (1942). Instead, we are convinced that the partnerships intended to be involved in nonrecurring "one-shot deals." Accordingly, we hold that the research or experimental expenditures of CRI, BS, Quoin, MDS, TRI, and PS were not paid or incurred in connection with trades or businesses, as is required by section 174. II. Entitlement To Certain Deductions
FINDINGS OF FACT A. Computech Research Investors, Ltd. (CRI)
For the taxable year 1980, CRI reported (on Form 1065) deductions for salaries to partners of $ 10,000 and legal and professional fees of $ 15,000. In 1980, the amount for salaries was paid to CRI's general partner (as authorized under CRI's partnership agreement), and the legal and professional fees were paid to the law firm of Rapoport and Lewis. In a partnership examination report dated April 30, 1984, respondent disallowed $ 8,500 of the deduction for salaries to partners and the entire deduction for legal and professional fees. The report proposed that the disallowed deductions be reallocated between syndication fees and amortizable organization costs. The Martyrs deducted their distributive share *666 of such items, which respondent disallowed. B. Mass Data Storage (MDS)
For the taxable year 1980, MDS reported (on Form 1065) a deduction for legal and professional fees of $ 16,000. The Martyrs deducted their distributive share of such fees, which respondent disallowed. On October 15, 1980, the law firm of Rapoport and Lewis issued a statement of account to MDS which shows that MDS actually paid $ 20,000 (not $ 16,000) in legal fees in the year 1980. The statement indicates that $ 11,329.57 of the fees relates to a tax opinion letter prepared for MDS. The balance of $ 8,670.43 represents a variety of legal services rendered in connection with the organization of MDS. C. Blueprint Software (BS)
For the taxable year 1982, BS reported organizational expenses of $ 1,600, which was explained on the partnership return (Form 1065) as follows: As prescribed by § 248(a) of the Internal Revenue Code of 1954 * * *, Taxpayer hereby elects to amortize all organizational and incorporation expenditures ratably over a period not less than or greater than sixty (60) months.
Amount - $ 8,000 Period - 60 Months Current - $ 1,600 Prior - $ 533 Petitioner Michael Gatto and petitioners Philip A. and *667 Stephanie M. Gatto deducted their distributive share of such expenses, which respondent disallowed. D. Quoin Software (Quoin)
For the taxable year 1982, Quoin reported organizational expenses of $ 3,000, which was explained on the partnership return (Form 1065) as follows: As prescribed by § 248(a) of the Internal Revenue Code of 1954 * * *, Taxpayer hereby elects to amortize all organizational and incorporation expenditures ratably over a period not less than or greater than sixty (60) months.
Amount - $ 15,000 Period - 60 Months Current - $ 3,000 Prior - $ -0- Petitioner Michael Gatto and petitioners Philip A. and Stephanie M. Gatto deducted their distributive share of such expenses, which respondent disallowed. OPINION Respondent argues that petitioners have failed to prove that they are entitled to deduct their distributive shares of certain deductions reported by the partnerships. Petitioners have presented no argument. As a general rule, the determinations of the Commissioner are presumed to be correct, and the taxpayer bears the burden of proving that such determinations are in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). In the present cases, petitioners bear *668 the burden of proof. With respect to CRI, the Martyrs have proven that the amount of disallowed deductions for salaries to partners and legal and professional fees was actually paid in 1980. However, they have failed to prove that respondent erred in determining that the disallowed deductions should be reallocated between syndication fees and amortizable organization costs. See sec. 709. Accordingly, we uphold respondent's determination. MDS reported a deduction for legal and professional fees of $ 16,000 for the year 1980. However, a statement of account from the law firm of Rapoport and Lewis, dated October 15, 1980, shows that a total of $ 20,000 in legal fees was paid in 1980. The Martyrs have not explained why the amount of the deduction differs from the amount shown on the statement. Nevertheless, we find that the deducted amount is a portion of the fees shown on the statement. Section 709(a) provides that no deduction is allowed for any amounts paid or incurred "to organize a partnership or to promote the sale of (or to sell) an interest in such partnership." The statement of account expressly provides that $ 11,329.57 of the fees relates to a tax opinion letter included *669 in MDS's private placement memorandum. We hold that the fee paid for the tax opinion letter represents a nondeductible syndication fee, because it was paid to promote the sale (or to sell) partnership interests in MDS. See Surloff v. Commissioner, 81 T.C. 210, 244-246 (1983). The balance of $ 8,670.43 represents a variety of legal services rendered in connection with the organization of MDS. Organizational expenses are not currently deductible, but under section 709(b) may be amortized ratably over a period of not less than 60 months. The partnership return for MDS for the year 1980 states that business started on September 16, 1980, and that its year end was December 31, 1980. Thus, the period between when MDS stated it started business and its year end was 3-1/2 months, which we will round off to 4 months. Accordingly, we hold that the Martyrs are entitled to deduct their distributive share of an organizational fee amortization deduction by MDS of $ 578.03 (4/60 times $ 8,670.43). With respect to both BS and Quoin, the partnerships' returns show how the amortization expense deductions were computed. [9] However, petitioners have failed to substantiate the reported organizational *670 fees of BS and Quoin in the respective amounts of $ 8,000 and $ 15,000, which are the bases for the amortization deductions. Accordingly, we uphold respondent's determination. III. Additional Interest Under Section 6621(c)
OPINION Respondent determined that petitioners were liable for additional interest under section 6621(c) because of losses disallowed by reason of the at risk rules of section 465. In general, if there is a substantial underpayment attributable to a "tax motivated transaction," the interest rate on that underpayment is 120 percent of the regular underpayment interest rate. Sec. 6621(c)(1). The definition of the term "tax motivated transaction" includes any loss disallowed by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). In light of our conclusion above that section 465(b)(3)(A) does not apply to the activities of the limited partnerships, no losses will *671 be disallowed in this case by reason of section 465(a). Consequently, we hold that petitioners are not liable for additional interest under section 6621(c). IV. Deductibility Of Interest Payments To Trusts
FINDINGS OF FACT Dennis DiRicco drafted a "Declaration of Trust" (Trust) for petitioner Michael Gatto. Petitioner was trustor and Mr. DiRicco served as trustee. On December 11, 1981, petitioner established the Trust and irrevocably transferred a sum of cash to it as initial Trust corpus. As trustee, Mr. DiRicco agreed to hold, administer, and distribute the corpus in accordance with the terms of the Trust. The named beneficiaries of the Trust were Mr. Gatto's niece and nephew. The Trust stated that it was to be governed by the laws of California. The Trust essentially provided for distributions of net income and capital gains at least annually to, or for the benefit of, the named beneficiaries until termination of the Trust. However, if Mr. DiRicco (as trustee) determined that there existed a compelling reason to postpone distribution, he could do so until the reason for postponement ceased to exist or the beneficiaries reached the age of 18. The Trust would terminate upon *672 the earlier of the expiration of ten years and one month after the date of its creation or the death of the named beneficiaries. Upon termination, the Trust provided that all trust corpus and accumulated and undistributed income in the hands of Mr. DiRicco (as trustee) would be transferred back to petitioner (as trustor) or his estate. [10]
Shortly after petitioner transferred cash to the Trust, Mr. DiRicco *673 would return the cash to petitioner in exchange for promissory notes, bearing an interest rate of 20 percent. [11] On December 16, 1982, petitioner paid $ 4,400 of "interest" due on one such note and deducted the amount on Schedule A of his 1982 Federal income tax return, Form 1040. Respondent disallowed the entire interest deduction. OPINION The issue we must decide is whether petitioner Michael Gatto may deduct, as interest expense under section 163, certain payments made on a promissory note to a Trust he established. Petitioner bears the burden of proving that respondent's determination is in error. Welch v. Helvering, supra; Rule 142(a). A deduction is generally allowed on "all interest paid or accrued within the taxable year on indebtedness." Sec. 163(a). The term indebtedness means an unconditional and legally enforceable obligation for the payment of money. Linder v. Commissioner, 68 T.C. 792, 796 (1977). *674 The determination of whether an obligation is legally enforceable requires an analysis of the law of the State in which the transaction occurred. Linder v. Commissioner, supra.The State's highest court is the best authority on its own law, but if there is no decision by that court, then we must apply what we find to be the State's law after giving "proper regard" to relevant rulings of other courts of the State. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). If an obligation is not enforceable under pertinent State law, any interest paid on the obligation is not deductible. Linder v. Commissioner, supra.
The pertinent State's law in this case is the law of the State of California. Under California law, a gift of a donor's promissory note does not create an enforceable obligation since there is no consideration for the promise. Herbert v. Lankershim, 9 Cal.2d 409, 71 P.2d 220 (1937); In re McConnell's Estate, 6 Cal.2d 493, 58 P.2d 639 (1936); Coon v. Shry, 209 Cal. 612, 289 P. 815 (1930); Tracy v. Alvord, 118 Cal. 654, 50 P. 757 (1897); see Crosby v. Commissioner, T.C. Memo. 1977-350. The gift of a promissory note is merely a promise, without consideration, to *675 give a sum of money in the future and is of no legal consequence. Tracy v. Alvord, supra; Hironymous v. Hiatt, 52 Cal. App. 727, 199 P. 850, 853 (1921); see Crosby v. Commissioner, supra.
In the instant case, shortly after petitioner transferred cash to the Trusts, Mr. DiRicco (as trustee) would return the cash to petitioner in exchange for promissory notes, bearing an interest rate of 20 percent. Petitioner deducted $ 4,400 in "interest" paid to the Trust on his 1982 return. We considered trusts with similar terms which were drafted by Dennis DiRicco in Alexander v. Commissioner, T.C. Memo. 1990-141. Petitioner essentially argues (as was argued in Alexander) that the transfer of cash to the Trust and the almost immediate loan back of the same funds to them by the Trust should be viewed as two separate and distinct transactions. If viewed as such, since there was consideration given by the Trust (cash) for the promissory note of petitioner, the note was enforceable and the interest was thus deductible. In contrast, respondent essentially argues that in substance the two transactions were mere steps in a single integrated transaction, relying upon Preston v. Commissioner, 44 B.T.A. 973 (1941), *676 revd. 132 F.2d 763 (2d Cir. 1942), and Wilken v. Commissioner, T.C. Memo. 1987-272. In Preston, the taxpayer borrowed $ 125,000 from a bank on October 18, 1934, and delivered that amount to a second bank, as trustee, to be held under a trust indenture for the benefit of a sister-in-law. The trustee was authorized under the trust indenture to lend that entire amount to the taxpayer on his bond. On October 19, 1934, the taxpayer delivered to the trustee his bond under seal, in which he covenanted to pay $ 125,000 in 20 years with interest at four percent per annum. The trustee delivered $ 125,000 to the taxpayer, and the taxpayer used that amount to satisfy his loan from the first bank. On the above facts, the Board of Tax Appeals held that the only reasonable inference to be drawn from the various steps taken and the carefully drafted provisions of the trust indenture is that it was agreed between the taxpayer and the first bank that the $ 125,000 which he delivered to the trustee was to be returned to him almost immediately as a "loan." The payment to the taxpayer of money which he himself supplied to the trustee for the very purpose cannot be a loan to him or furnish consideration *677 for his bond. The practical effect of what was done was to set up a trust composed solely of the taxpayer's bond. Preston v. Commissioner, 44 B.T.A. at 977. The Second Circuit in Preston agreed with the Board that the "loan" by the trustee cannot be deemed consideration for the taxpayer's covenant to pay the trustee $ 125,000 on a specified future date, and four percent annual interest before maturity. The Circuit Court went on to say that while there was no finding of an agreement by the trustee on receipt of the money to lend it immediately back to the taxpayer, that is the only reasonable inference to be drawn from the steps taken and the carefully drafted provisions of the trust indenture. The Circuit Court agreed that the surrounding facts created such an inference. Thus, the court held that "except for the seal," the settlor never lost control of the sum he turned over to the trustee. 132 F.2d at 765. (Emphasis added.) The Second Circuit reversed the Board, however, because under the law of New York at the time the note was given, the seal affixed to the bond conclusively imported a consideration under New York law. [12] *678 More recently, we applied the reasoning in Preston to disallow a claimed interest deduction in Wilken v. Commissioner, supra. In Wilken, on August 7, 1978, one of two taxpayers assigned her interest in two $ 10,000 savings certificates to a trust. The next day, each of the taxpayers obtained an unsecured, one-day bank loan of $ 40,000. The $ 80,000 borrowed from the bank was contributed to trust corpus. On August 9, 1978, each petitioner executed a $ 40,000 interest-bearing promissory note in favor of the trustee, and paid off the bank loans. The taxpayers deducted the interest payments on their Federal income tax returns. We held in Wilken that the net effect of the series of transactions surrounding the creation of the trust was that the taxpayers made transfers to the trusts of their own notes, which are unenforceable under State law either by the trustee or by the trust's *679 beneficiaries and are no more than promises to make gifts in the future. As a consequence, the so-called interest payments were held nondeductible under section 163(a). Wilken v. Commissioner, supra.
The operative facts in petitioner's case are analogous to those present in Preston and Wilken, and are identical in all material respects to those of the trusts we considered in Alexander v. Commissioner, T.C. Memo. 1990-141. As in those cases, we believe that no reasonable inference can be drawn from the facts present other than that petitioner's transfer of cash to the Trust and the loan back of the same amount shortly thereafter was in substance a single integrated transaction. Accordingly, we hold that the interest payments by petitioner are not deductible under section 163. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith for trial, briefing, and opinion: Michael Gatto, docket No. 41299-86; and Philip A. Gatto and Stephanie Gatto, docket No. 41300-86.↩
2. On July 27, 1989, Mr. DiRicco resigned from the Tax Court Bar, effective October 10, 1989.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Interest equal to 120 percent of interest payable with respect to any substantial underpayment attributable to tax motivated transactions.
**. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
4. This section was originally enacted as section 465(c)(3)(E). It was redesignated as section 465(c)(3)(D) by sec. 503(a), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2243.↩
5. With respect to CRI, this issue was also the subject of our opinion in Alexander v. Commissioner, T.C. Memo. 1990-141, which involved taxpayers other than petitioners in this case.
6. This issue was also the subject of our opinion in Alexander v. Commissioner, supra↩, which involved taxpayers other than petitioners in this case.
7. Sec. 6621(d) was renumbered as sec. 6621(c) by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744, and was repealed with respect to returns due, without regard to extension, after December 31, 1989, by the Revenue Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2107.
8. Philip A. Gatto and Stephanie Gatto agreed to be bound by the final decision on this issue in the case of Eddie S. and Janice Fink, docket No. 21099-86, addressed in Alexander v. Commissioner, supra↩.
*. $ 60,653 of which was attributable to a reduction in R & D costs deducted in 1981.↩
9. As a point of information, however, we note that both BS and Quoin erroneously reported that the amortization of organizational expenditures was deductible under section 248(a)↩, which only applies to corporations. Section 709 applies to the treatment of organization and syndication fees by partnerships.
10. Prior to amendment by section 1402(a) of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, 2711-2712, section 673(a) treated a trust grantor as the owner of any portion of a trust in which he had a reversionary interest in either the corpus or income if the interest would, or was reasonably expected to, take effect in possession or enjoyment within 10 years commencing with the date of the transfer of that portion of the trust. Accordingly (before TRA 86), the income from a trust with a reversionary interest in the grantor and a specified duration of more than 10 years would be taxable to the trust's beneficiary. This form of trust was commonly referred to as a "Clifford trust," drawing its name from the seminal case of Helvering v. Clifford, 309 U.S. 331↩ (1940).
11. The following deposits and withdrawals occurred within the Trust's bank account through January 3, 1984, substantiating this pattern: ↩
Deposits
Withdrawals
Date
Amount
Date
Amount
12/12/81
$ 10,020
12/14/81
$ 10,000
12/16/81
2,000
1/5/82
2,000
11/15/82
10,000
11/16/82 (total)
10,000
12/16/82
4,400
1/5/83
4,400
12/18/83
3,960
1/3/84
3,960
12. In Linder v. Commissioner, 68 T.C. 792, 796 n. 4 (1977), we noted that -- In the intervening years, the holding in the Preston case has been displaced by a modification of New York law. N.Y. Gen. Constr. Law sec. 44↩a (McKinney Supp. 1977). At the present time in New York, the seal, except as otherwise expressly provided by statute, is without legal effect. * * *