DIGITAL ACCOUNTING TECHNOLOGY, LTD., JEFFREY L. RAYDEN, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Digital Accounting Technology v. Commissioner
Docket No. 14038-93
United States Tax Court
T.C. Memo 1995-339; 1995 Tax Ct. Memo LEXIS 341; 70 T.C.M. (CCH) 178; July 26, 1995, Filed *341 Decision will be entered for respondent. For petitioner: Joseph F. Moore. For respondent: Steven M. Roth. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent mailed to petitioner Jeffrey L. Rayden (petitioner), as tax matters partner, a notice of final partnership administrative adjustment for 1983 with respect to Digital Accounting Technology, Ltd. (DAT). After settlement by the parties, the only issue for decision is whether $ 904,268 in expenditures of DAT qualify as deductible research and development expenditures under section 174. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1983. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Sherman Oaks, California. In 1978, petitioner and other members of petitioner's family (the Rayden Family) formed United Commercial Insurance Services, Inc. (UCIS) as a California corporation for the stated purpose of developing and selling check protector machines, supplies, and forgery insurance. A majority of the outstanding shares of stock in UCIS were owned by the Rayden Family. *342 Check protectors in use in 1983 were operated by hand and were used by businesses, at the time checks were made, to inscribe onto the checks information such as payee, amount, and signature of the payor. This information was inscribed onto the checks with special dyes and multicolored ink. Check protectors were also used to emboss that portion of the checks that reflected the payee information, causing the payee information to be raised from the surface of the check. As a result of the use of check protectors in the above manner, unauthorized alterations and forgeries of checks were reduced. Petitioner, as president of and on behalf of UCIS, was instrumental in the invention and development of several products designed to improve check protector machines. In March of 1981, petitioner, on behalf of UCIS, began investigating development of a more advanced machine to replace mechanical, hand-cranked check protectors that at the time were the industry standard. After conducting a feasibility study, petitioner concluded that development of improved technology for check protectors was feasible and that approximately $ 1.5 million would be needed to fund necessary research on and development *343 of the improved technology. Petitioner, on behalf of UCIS, hired a national accounting firm to assist in raising capital to fund the research and development relating to improvements to check protectors. After discussing alternatives with UCIS, representatives of the accounting firm recommended that a limited partnership be formed to raise capital for the research and development activity. Representatives of the accounting firm suggested Century Computer Corp. (Century) and North American Investment Group, Ltd. (NAIG) as potential general partners of the limited partnership to be formed. Century was a Nevada corporation engaged in the business of research and development, manufacture, and sale of minicomputers and related software. NAIG was a Texas limited partnership formed to invest in various high technology enterprises and to undertake research and development projects. After consulting with Century and NAIG, it was concluded that development of check "processors", or enhanced and computerized check protectors, would be the objective of the new limited partnership and that $ 3 million would be needed to fund research on and development of check processors. In June of 1982, *344 Innovative Research, Inc. (IRI), acquired the research and development division of Century. IRI was a Texas corporation engaged in the business of research and development of computer products unrelated to the check protector market. On December 29, 1983, petitioner and representatives of Century and NAIG formed DAT as a Texas limited partnership for the stated purpose of engaging in research and development relating to check processor technology. The general partners of DAT were Century and NAIG. Although DAT was formed for the stated purpose of engaging in research and development of check processor technology, it was clear from the beginning that DAT would enter into an agreement (the R&D Agreement) with another entity for actual performance of the research and development activity. On or about December 29, 1983, members of the Rayden Family formed United Commercial Research Services Corp. (UCRS) as a California corporation also for the stated purpose of conducting research and development of check processor technology. A majority of the outstanding shares of stock of UCRS were owned by the Rayden Family and by UCIS. Further, in December of 1983, UCRS and IRI formed yet another *345 entity, namely Business Systems Design (Business Systems) as a joint venture, for the stated purpose of conducting for DAT the research and development activity relating to check processor technology. Private Placement Memorandum and Limited Partnership Investments
Representatives of Century or NAIG drafted a private placement memorandum (PPM) regarding limited partnership investments in DAT, and they distributed copies of the PPM to interested investors. It was explained in the PPM that the stated purpose and business of DAT was to conduct research and development activity relating to computerized check processor technology. It was acknowledged in the PPM, however, that actual research on and development of the technology relating to check processors would be performed through Business Systems, not through DAT, and that UCRS and UCIS, not DAT, would manufacture and market, under an exclusive license agreement, any check processors developed from the technology. As between UCRS and IRI (the two partners of Business Systems), UCRS was to be primarily responsible for the actual research and development of check processor technology. It was explained further in the PPM that *346 in exchange for the exclusive manufacturing and marketing rights given to UCRS and to UCIS, DAT would receive royalty payments from sales of check processors manufactured from the technology to be developed. It was explained in the PPM that DAT would remain in business until the later of December 31, 2013, or when DAT ceased to receive royalty payments or any other income. It was acknowledged in the PPM that all of the essential activities relating to the actual research on and development of check processor technology would be performed by Business Systems and that all of the essential activities relating to actual manufacturing and marketing of check processors would be performed by UCRS and by UCIS. The technology to be developed by Business Systems was described in the PPM as technology relating to computerized check processors that would replace check protectors and related products that were at the time standard in the industry. At that time, check protectors used three or four time-consuming steps to inscribe the critical information onto each check. The check processor technology to be developed by Business Systems would combine these steps into one step. Check processors *347 to be manufactured from the technology to be developed would include a function to allow pertinent information on the checks to be recorded in the computerized check processor database simultaneously with making checks. This process would allow check processors to maintain check disbursement records and perform other accounting functions. Moreover, check processors would include automated reporting and accumulation features which would allow the processors to keep current and ongoing totals of the number of checks written and the amount of funds disbursed. The check processors were to include an impact printer that would allow checks to be printed and would make forging and alteration of checks more difficult than with existing check protectors. It was represented in the PPM that investors in DAT could expect to receive from DAT cash distributions and tax benefits. Intended tax benefits would accrue to investors in the form of tax deductions relating to payments made by DAT to Business Systems for research and development of the new technology. It was represented in the PPM that payments to Business Systems would qualify as expenditures for research and development of check processor *348 technology, that the payments would be treated as currently deductible expenses under section 174, and that the expense deductions would be passed through to limited partner investors in DAT. Revenue projections for DAT were provided in the PPM based on sales estimates of check processors to be manufactured with technology to be developed by Business Systems. Revenue projections were based only on estimates of royalty payments that DAT would receive from sale of check processors by UCRS and by UCIS. The revenue projections did not include estimates of revenue to be earned by DAT if DAT itself ever directly manufactured and marketed check processors. Included in the PPM was a balance sheet for Century for May 31, 1983, reflecting that Century had total equity (net of liabilities) of $ 531,272. DAT offered to a maximum of 35 investors the opportunity to purchase a total of 100 limited partnership units for a stated purchase price of $ 33,000 per unit. The $ 33,000 stated per unit purchase price was to be paid by investors with a $ 13,000 cash downpayment and a $ 20,000 recourse promissory note bearing interest at 10 percent per year. Potential funds to be raised from limited partners *349 in DAT totaled approximately $ 3.3 million. It was explained in the PPM that the two general partners of DAT would invest an amount equal to 1 percent of the total amount invested by limited partners or a maximum of $ 33,000 ($ 3.3 million times 1 percent). Only if the limited partners unanimously elected for DAT to finance further research and development activities would the limited partners be required to invest additional funds. The general partners were likewise not obligated to invest additional funds in DAT. The PPM explained that the approximate $ 3.3 million to be raised through investments would be expended on the following activities: Research and Development
$ 2,926,917
Offering Costs
50,000
Management Fees
132,000
Brokerage Fees
198,000
Working Capital
26,416
Total
$ 3,333,333
During 1983, DAT sold to 16 investors only 30 limited partnership units. A family partnership, in which petitioner and his father were partners, purchased five limited partnership units in DAT. For each of the 30 limited partnership units actually sold to investors in 1983, each investor paid to DAT the required $ 13,000 in cash and executed the required $ 20,000 promissory *350 note bearing interest at 10 percent per year. Under the terms of each promissory note, each investor became obligated to make principal payments of $ 13,000 on March 1, 1984, and $ 7,000 on March 1, 1985, with interest. In 1983, cash contributions received by DAT from investors totaled $ 390,000. In December of 1983, part of this $ 390,000 was used by DAT to pay syndication and startup costs, and $ 304,268 was paid to Business Systems pursuant to the R&D Agreement for research and development of check processor technology. The record does not establish whether DAT received the capital contributions due from the two general partners. All of the payments of principal and interest required to be made by investors under the terms of the promissory notes were timely made. In March of 1984, the limited partners paid to DAT a cumulative total of $ 390,000 plus accrued interest on their promissory notes. In March of 1985, the limited partners paid to DAT the remaining cumulative balance due on their promissory notes in the total amount of $ 210,000 plus accrued interest. In 1984 and 1985, most of the funds received by DAT as payment on the investors' promissory notes were transferred by *351 DAT to Business Systems. Thus, between 1983 and 1985, a total of $ 904,268 was paid by DAT to Business Systems for research and development of check processor technology. R&D and Technology Transfer Agreements, Exclusive License, and Actual R&D Activity
On December 29, 1983, with regard to the research, development, manufacture, and marketing of check processor technology, DAT entered into an R&D Agreement with Business Systems and a Technology Transfer Agreement with UCRS and UCIS. Under the terms of the R&D Agreement, Business Systems, not DAT, was to perform all research and development relating to the technology, and DAT agreed to pay to Business Systems an up-front cash payment of $ 304,268 (equal to the cash downpayments received from investors in DAT, net of startup costs) and an additional $ 600,000 reflected by a $ 600,000 promissory note bearing interest at 10 percent. On December 29, 1983, DAT executed the $ 600,000 promissory note in favor of Business Systems. Payments by DAT on the $ 600,000 promissory note were due in 1984 and 1985 and were to be funded by payments received from limited partners on the promissory notes they executed in favor of DAT. Under the *352 R&D Agreement, Business Systems was required to send to DAT semi-annual reports summarizing progress made and current status of the research and development activity. Business Systems, in the sole discretion of its management, was responsible for deciding when further research and development was no longer necessary and when a product using the technology was ready to be manufactured. Upon either event, Business Systems was required to prepare and to submit to DAT a written report describing development of the technology. Upon submission by Business Systems of this report to DAT, the research and development project would be regarded as complete. Under the R&D Agreement, DAT technically retained all right, title, and interest in the technology to be developed. The R&D Agreement was to terminate on the earlier of December 31, 1985, or the date on which the research and development activity was complete. Under the terms of a Technology Transfer Agreement that was executed between DAT, UCRS, and UCIS, if any technology was actually developed under the R&D Agreement, UCRS and/or UCIS effectively had 60 days to exercise an option to acquire from DAT an exclusive, worldwide license to *353 manufacture, market, and sell the developed technology (the Exclusive License). [1]
Once exercised, *354 the Exclusive License to manufacture and market the developed technology did not have an expiration date. If the option to acquire the Exclusive License was exercised, UCRS or UCIS would have to pay DAT an up-front cash payment and royalty payments on sales of the developed technology, as follows: (1) $ 100 in up-front cash; (2) royalties of 17 1/2 percent of sales until DAT had been paid $ 3.3 million; then (3) royalties of 5 percent of sales until DAT had been paid a second $ 3.3 million; then (4) royalties of 2 1/2 percent of sales until DAT had been paid a third $ 3.3 million; then (5) royalties of 2 percent of sales until DAT had been paid a fourth $ 3.3 million; and (6) thereafter, royalties of 1 percent of sales.
In the R&D Agreement, the technology to be developed by Business Systems was referred to as check "protector" technology. In the Technology Transfer Agreement, the technology to be developed was referred to as check "processor" technology. The Technology Transfer Agreement, however, refers to the technology to be developed under the R&D Agreement as if the R&D Agreement encompassed check "processor" technology. The following language from the *355 Technology Transfer Agreement expressly refers to check "processor" technology to be developed under the R&D Agreement. This language from the Technology Transfer Agreement also explains that the Exclusive License available to UCRS and UCIS included "any" technology developed under the R&D Agreement -- [DAT] shall hold title to all items of Technology as defined herein, as it relates to computerized check processor systems, whether patentable or copyrightable or not, developed under said * * * [R&D] Agreement; and * * * [UCRS and UCIS] desires to acquire a license * * * to any item of Technology developed under the Research Program in order to ascertain the applicability of such Technology to its product line; and, upon such review, to have the option to acquire the license to the use of such Technology on an exclusive, world-wide basis * * *. [Emphasis added].
As required by the R&D Agreement, petitioner, on behalf of UCRS, mailed to DAT a progress report dated March 13, 1984, in which it was reported that research and development of the technology was proceeding according to plan. In early 1984, UCRS requested an independent marketing research *356 firm to conduct a study to evaluate the market potential of the technology being developed. In December of 1984, UCRS received from the marketing research firm a report in which the firm concluded that the planned check processor represented a viable product. The report also noted functions that should be included in the check processor and the sensitivity of the potential market to pricing. Also, the largest potential market for check processors was identified as medium-sized businesses with under $ 1 million in annual sales. By July or August of 1984, Business Systems had successfully developed check processor technology. The developed check processor technology included the functions described in the R&D Agreement relating to check protector technology and also included more advanced technology such as the capability to encode magnetic ink character recognition (MICR) on the bottom of checks. Business Systems was able to develop three different types of check processors from the new technology. Based in part on results of the marketing research report, UCRS concluded that it would seek to have manufactured and marketed two of the three types of check processors that had been *357 developed. A Model 201 check processor was to be manufactured for medium-sized businesses. A Model 301 check processor was to be manufactured and sold as a compact version of the Model 201 check processor for use in homes and small businesses. UCRS received a number of bids and proposals from various companies to manufacture Model 201 check processors. Each of the bids, however, was too high and was rejected. Attempts by UCRS and UCIS to have check processors manufactured and marketed at a reasonable price were unsuccessful. DAT did not attempt to manufacture or market check processors on its own behalf. No check processors were ever manufactured. No sales were made, and UCRS and UCIS never paid any royalties to DAT. Apparently, technology similar to check processor technology that was developed by Business Systems is currently available in the marketplace. DAT's activities with regard to development of technology relating to check processors were ministerial in nature and were limited to paying bills, receiving status reports from Business Systems, keeping limited partners informed of research and development activity of Business Systems regarding check processor technology, *358 and filing tax returns. The success of DAT was dependent on research, development, manufacture, and marketing efforts of Business Systems, UCRS, and UCIS. On its 1983 partnership information tax return, DAT used the accrual method of accounting and deducted $ 904,268 in expenditures relating to research and development of check processor technology. On audit, respondent determined that DAT was not engaged in a trade or business in connection with research and development of check processor technology as required by section 174 and therefore that DAT was not entitled to deduct the claimed research and development expenditures. OPINION Section 174(a)(1) provides generally that a "taxpayer may treat research or experimental expenditures which are paid or incurred * * * during the taxable year in connection with [a] trade or business as expenses which are not chargeable to [a] capital account." Under this section, expenditures incurred by a taxpayer for research and development in connection with a taxpayer's trade or business are deductible by the taxpayer as ordinary expenses in the year in which they are incurred. Section 174(a)(1) applies to research and development expenditures *359 incurred directly by a taxpayer and also to research and development expenditures incurred by another at the request of and on behalf of a taxpayer. Sec. 1.174-2(a)(2), Income Tax Regs.
A taxpayer is entitled to ordinary deductions for research and development expenditures even if, at the time the research and development expenditures were incurred, a taxpayer was not producing or selling a product and was not then engaged in a trade or business. Snow v. Commissioner, 416 U.S. 500, 503-504 (1974). In order to be entitled to a deduction under section 174, however, there must have been, during the year at issue, a realistic prospect that the taxpayer would eventually be engaged in such a trade or business. Scoggins v. Commissioner, 46 F.3d 950, 953 (9th Cir. 1995), revg. T.C. Memo. 1991-263; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991); see also Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987). In situations such *360 as that involved herein, where a partnership effectively grants to another entity an exclusive option to acquire all rights to manufacture and market a technology to be developed, the deductibility under section 174 of expenditures incurred by the partnership turns on whether there was a "realistic prospect" that the technology to be developed would be exploited in a trade or business of the partnership. Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, supra at 439. As a practical matter, the grant of an exclusive license to another to exploit technology to be developed prior to commencement of the related research and development activity may be regarded as precluding a licensor from ever engaging in a trade or business with respect to the technology. Spellman v. Commissioner, 845 F.2d at 150-151; Levin v. Commissioner, 87 T.C. at 726-727. Under section 174, in order to be entitled to deductions for research and development expenditures, the taxpayer must have been more *361 than a mere passive investor. Scoggins v. Commissioner, supra; Green v. Commissioner, 83 T.C. 667, 688 (1984). To distinguish between a taxpayer who was merely a passive investor and a taxpayer who was actively engaged in a trade or business in connection with research and development expenditures, or a taxpayer who had a realistic prospect of eventually engaging in a trade or business in connection with research and development expenditures, all of the surrounding facts and circumstances are relevant, including: (1) The intent of the parties to the agreements; (2) the amount of capital retained by the taxpayer during the conduct of research and development activity; (3) the exercise of control by the taxpayer over the person or entity performing the research; (4) the business activity of the taxpayer during the year in question; and (5) the experience of the taxpayer and of the others involved. Scoggins v. Commissioner, supra; Diamond v. Commissioner, supra; Levin v. Commissioner, supra; Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572. *362 Respondent argues that, with regard to research and development of check processor technology, DAT did not have the requisite profit objective and DAT did not exercise sufficient direction and control over Business Systems, UCRS, and UCIS in order for DAT itself to be regarded as being actively engaged in a trade or business. Respondent also argues that because DAT did not retain sufficient capital, because DAT granted to UCRS and to UCIS an option to acquire an exclusive license to manufacture and market the check processor technology to be developed, and because Business Systems, UCRS, and UCIS were to perform all aspects of the research, development, manufacture, and marketing of check processor technology, there was no realistic prospect that DAT itself would ever be engaged in a trade or business in connection with check processor technology. Petitioner argues that because the R&D Agreement refers to research and development of check protector technology and because the Technology Transfer Agreement by its terms applies to technology to be developed under the R&D Agreement, the option to acquire an exclusive license only applied to check protector technology and did not apply *363 to check processor technology that was actually developed. Petitioner, therefore, argues that DAT did not give up any rights to check processor technology and that DAT should be treated as having a realistic prospect of engaging in a trade or business with regard to the check processor technology that was actually developed. Petitioner also argues that because UCRS and UCIS never exercised the option to acquire the Exclusive License, DAT retained the right to engage in a trade or business with regard to all of the technology developed under the R&D Agreement. The PPM, the R&D Agreement, and the Technology Transfer Agreement make it clear that DAT was to exercise little direction or control over Business Systems, UCRS, and UCIS. The financial success of DAT was dependent upon the ability of Business Systems to successfully develop improved check protector and check processor technology to replace hand operated check protectors. The profitability of DAT was dependent on the success of Business Systems in developing the technology and on the efforts of UCRS and UCIS in manufacturing and marketing the technology. DAT essentially placed total reliance upon the management and experience *364 of personnel of Business Systems, UCRS, and UCIS. DAT expended essentially all of the funds received from investors to pay Business Systems, and it retained only limited capital to fund any business activity involving the technology. Beyond the initial funding of DAT, the two general partners and the limited partners were under no obligation to furnish additional capital to DAT. The PPM explicitly stated that none of the essential activity relating to the technology to be developed would be conducted directly by DAT. UCRS, a corporation controlled by the Rayden Family, was established to manufacture, market, and sell products resulting from the technology. The two general partners of DAT retained essentially no control over the research activity of Business Systems concerning the technology. Business Systems was to make all of the business decisions regarding when and how the research was to be accomplished. Century, one of the general partners of DAT, engaged only in ministerial activities during and after completion of the research. Century kept records, wrote checks for organizational and research expenditures, and filed partnership information tax returns. These are the type *365 of activities that are typical of an investor merely managing investments. Green v. Commissioner, 83 T.C. at 688-689; Double Bar Chain Co. v. Commissioner, supra.
There is little or no evidence in the record that NAIG, DAT's other general partner, engaged in any business activity relating to the research. DAT became involved with the development of the new technology only to the extent that it provided Business Systems with necessary capital. DAT existed only to finance Business Systems development of the technology and to provide investment opportunities and tax benefits to DAT's partners. In all likelihood, if improved check protectors and check processors were manufactured using the technology developed, DAT would earn income only by receiving royalties from sale proceeds earned by UCRS and UCIS. Although the various agreements used slightly different language to describe the technology to be developed, we conclude that the use of different language was not significant. Petitioner testified at trial that check protector technology was incorporated into the developed check processor technology. The Technology *366 Transfer Agreement referred to both check "protector" and to check "processor" technology. In fact, Business Systems developed check processor technology that encompassed check protector technology referred to in the R&D Agreement. Merely because the check processor technology actually developed was more advanced than originally planned does not make the agreements inapplicable to the technology that was developed. UCRS and UCIS had the option to purchase for a nominal $ 100 up-front cash payment and subsequent royalty payments an exclusive worldwide license with regard to the technology to be developed. The Exclusive License did not have an expiration date. This nominal purchase price is evidence that, had the new technology resulted in marketable products, UCRS and UCIS would have exercised the option to acquire the Exclusive License. In Scoggins v. Commissioner, 46 F.3d 950 (9th Cir. 1995), the U.S. Court of Appeals for the Ninth Circuit recently concluded that there existed a realistic prospect that the partnership involved in that case would eventually be engaged in a trade or business based on several facts that are distinguishable from the facts *367 of the instant case. In Scoggins, the individual taxpayers organized and controlled both a partnership and a research corporation to perform research on and development of equipment that could apply layers of silicon on silicon wafers. The individual taxpayers had significant experience in developing and marketing similar equipment, and they directed the research on and development of the equipment. The individual taxpayers had the ability to provide the partnership with sufficient capital to manufacture and market the equipment if the corporation did not do so. To the contrary, in the instant case, the general partners of DAT did not direct or control the research, development, manufacture, or marketing of the technology to be developed. The Rayden Family, through ownership of UCRS and UCIS, controlled the research, development, manufacture, and marketing of the technology. The Rayden Family did not own a controlling interest in DAT. The facts of this case are more similar to the facts of Diamond v. Commissioner, 92 T.C. 423 (1989), than to the facts of Scoggins v. Commissioner, supra.In Diamond, at the *368 time the partnership executed a research and development agreement, the partnership granted an option to the research contractor to acquire at some future time an exclusive license to the new technology. Our analysis focused on the likelihood that the research contractor would exercise the option to acquire the exclusive license if the technology turned out to have significant value. Diamond v. Commissioner, supra at 441. We concluded that no realistic prospect existed that the partnership would ever enter into a trade or business relating to the technology. Id. at 440-441. We perceive no meaningful basis upon which to distinguish the facts and conclusion in Diamond v. Commissioner, supra, from the facts in this case. We conclude that during the years at issue, DAT was not engaged in a trade or business in connection with the technology that was developed and that there existed no realistic prospect that DAT would ever be engaged in a trade or business in connection with the technology. DAT and its general partners lacked the intent to engage in a trade or business in connection with *369 the technology. The facts before us indicate that DAT did not intend to, nor did it, direct or control the research, development, manufacture, or marketing of the check processor technology that was developed. The activities that DAT (and the partners thereof) engaged in were typical of investors managing their investments and were not of the type that constitute a trade or business. DAT had no realistic prospect of ever engaging in a trade or business in connection with the technology that was developed. DAT is not entitled, under section 174, to the claimed deductions for research and development expenditures. Decision will be entered for respondent. Footnotes
1. Under the terms of the Technology Transfer Agreement, the parties defined the Exclusive License as follows: Each Item of Technology subject to the Option to Acquire hereunder is an exclusive license, and shall ipso facto↩ include an exclusive license from * * * [DAT] to * * * [UCRS and UCIS] to any and all necessary background data, trade secrets, know-how or any other technology, whether patented or not, heretofore licensed by * * * [UCRS and UCIS] to * * * [DAT] pursuant to paragraph 7 of the Research Agreement and necessary for the use of each such Item of Technology. Provided, that upon the dissolution of * * * [DAT], * * * [UCRS and UCIS], shall have the exclusive right to purchase outright all patents and/or related technology held by * * * [DAT] at the cost of two thousand five hundred dollars ($ 2,500.00) per patent and an accumulative sum of three thousand dollars ($ 3,000.00) for related technologies.