PROPERTY GROWTH COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Property Growth Co. v. Commissioner
Docket No. 39500-86.
United States Tax Court
T.C. Memo 1988-258; 1988 Tax Ct. Memo LEXIS 289; 55 T.C.M. (CCH) 1072; T.C.M. (RIA) 88258; June 16, 1988. James Anton Beitz, for the petitioner. Gail K. Gibson, for the respondent. PETERSON
MEMORANDUM OPINION PETERSON, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b), Internal Revenue Code of 1986, and Rules 180, 181 and 182. [1] Respondent determined deficiencies in petitioner's Federal income tax for the taxable years ending April 30, 1980, and April 30, 1983, in the amounts of $ 476.00 and $ 1,608.00, respectively. The sole issue is whether petitioner is entitled to deduct its distributive share of losses from its interests in a limited partnership *290 [2] which claimed a deduction for research and development pursuant to section 174. [3]
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner's principal place of business was located in Minneapolis, Minnesota, at the time the petition was filed in this case. The deductions in dispute were taken by Property Growth Associates, a Minnesota partnership (PGA) for expenses incurred for research and development of a computer aided retrieval system (CAR). The CAR is a desk-top computer system which uses a keyword data base to interface with a micrographics reader/printer and retrieve information from microfilmed documents. Once retrieved, the information can be viewed and/or printed by the computer operator. Additionally, the system can be used as a traditional *291 information processing system by changing the program disk. The idea for a CAR evolved from comments made by purchasers of Unilink, a product that had been developed and marketed by petitioner and Com Squared, Inc. (Com Squared). Com Squared incorporated on November 1, 1980. On its U.S. Corporate Income Tax Return (return) for the taxable year ending October 31, 1982, Com Squared reported a taxable loss in the amount of $ 12,868, after applying a $ 115,963 net operating loss carry forward (NOL) from 1981. On its return for the taxable year ending October 31, 1983, Com Squared reported a taxable loss in the amount of $ 172,732, which included the $ 12,868 NOL from 1982. Both Robert Siqveland (Siqveland), the founder of petitioner, and Gary Halleen (Halleen), the president and sole shareholder of Com Squared, realized that there was a market for a product such as the CAR and informally agreed to work together to develop and market the CAR. Prior to working on the CAR, Com Squared had acted as a research contractor on a number of projects because it did not have the financial resources to fund the development of its own products. However, Halleen intended to market the CAR *292 for the benefit of Com Squared. In April 1982, Com Squared began developing the CAR. On July 16, 1982, Property Growth V Microfilm -- R & D Limited Partnership (PG V) was formed pursuant to the Minnesota Uniform Limited partnership Act. PG V's stated purpose was to purchase the existing CAR technology and develop that technology for subsequent sale. PG V's general partner is PGA. Petitioner is a partner in PGA and a limited partner in PG V. On July 16, 1982, PG V and Com Squared executed a Technology Development Agreement (Development Agreement). Pursuant to this agreement, PG V paid $ 35,000 for the technology that had been developed by Com Squared in the three months prior to the execution of the Development Agreement and agreed to pay Com Squared $ 35,000 per month for additional development, with total payments not to exceed $ 450,000. If Com Squared's costs exceeded $ 450,000, Com Squared was required to complete the development at no additional cost to PG V. The Development Agreement also provided that the technology was to be developed to the specifications of PG V. Further, Com Squared agreed to use its best efforts to complete development by July 1, 1983. *293 Also, PG V had the right to determine whether Com Squared would be able to develop a marketable product. If PG V determined that Com Squared could not develop a marketable product, PG V was not required to make any additional payments. In addition, PG V would then be entitled to receive a refund of any unused funds and to have all of the technology and related documentation returned to PG V. Finally, PG V was entitled to inspect Com Squared's records upon reasonable notice. On July 16, 1982, Com Squared and PG V also executed a Technology License Agreement (License Agreement) whereby PG V granted Com Squared an exclusive license to "enjoy, commercialize and exploit the (CAR)," in exchange for a 10 percent royalty interest in Com Squared's sales after four units were sold. [4] The agreement provided that PG V had the right to inspect Com Squared's records on a quarterly basis, or sooner if PG V believed that Com Squared may be in default. The term of the License Agreement was to last until December 31, 1986, or until the exercise of a Technology Option Purchase Agreement (Option Agreement). *294 On July 16, 1982, PG V and Com Squared executed the Option Agreement which provided that Com Squared could purchase the technology from PG V by making a $ 6,000 payment and continuing the 10-percent royalty until December 31, 2023. Com Squared could exercise its option no sooner than one year after the CAR was reduced to practice and no later than one year and 181 days after the completion of development. If the option were exercised, PG V would have the right to inspect Com Squared's books on a quarterly basis. Siqveland spoke frequently with Halleen by telephone and met with him on a bi-weekly basis. Apparently, Siqveland provided substantial input with respect to marketing concerns and strategies but left the day to day supervision of the development to Halleen. Com Squared provided PGA with quarterly reports of its activities related to the progress of the CAR. Com Squared sold the first CAR on April 13, 1983, and sales have grown steadily since that date. In a letter dated January 12, 1984, Com Squared informed PG V that Com Squared was planning to purchase the technology pursuant to the July 16, 1982 Option Agreement. On September 1, 1984, PG V transferred its interest *295 in the CAR to Com Squared pursuant to the terms of the Option Agreement. At that time PG V had accrued $ 8,794 in commissions, with $ 3,225 attributable to sales during August 1984. Siqveland has remained involved with Com Squared and the CAR. He and other PG V partners have assisted Com Squared in marketing the CAR by helping to locate distributors. Additionally, Siqveland arranged for Com Squared to receive financing at times when Com Squared experienced financial difficulties. Com Squared submitted invoices to PGA in the amount of $ 337,587.64 for work performed during 1982. PGA deducted $ 302,588 of that amount as research and development costs under section 174 and amortized the remaining $ 35,000 as the cost of acquiring an intangible asset. Petitioner, in turn, claimed its share of losses for those amounts, as well as for other expenses, on its Federal income tax return for the fiscal year ending April 30, 1983. Respondent disallowed the section 174 deductions on the basis that PG V was not carrying on a trade or business. In Snow v. Commissioner,416 U.S. 500 (1974), the Supreme Court established that deductions under section 174 could be claimed *296 in connection with a trade or business even though the taxpayer was not currently producing or selling any product. However, the taxpayer must be engaged in a trade or business at some time and its activities must be sufficiently substantial and regular to constitute a trade or business to be entitled to such deductions. Green v. Commissioner,83 T.C. 667, 686-687 (1984); see Spellman v. Commissioner,T.C. Memo. 1986-403, affd. 845 F.2d 148 (7th Cir. 1988). Accordingly, we must determine whether PG V was in a trade or business with respect to the CAR. The fact that Com Squared and PG V characterized their dealings as a series of independent agreements is not determinative of the legal consequences. L-R Heat Treating Co. v. Commissioner,28 T.C. 894, 897 (1957). This Court will analyze the substance, not the form, of the transactions to determine the Federal income tax consequences. Gregory v. Helvering,293 U.S. 465 (1935). Pursuant to the terms of the License Agreement, Com Squared obtained the exclusive right to exploit the CAR until January 1987. The Option Agreement enabled Com Squared to *297 retain those rights indefinitely. The primary consideration that PG V received under both of the agreements was a 10 percent royalty interest. It is true that the various agreements may give the appearance that PG V intended to develop and own the CAR in connection with a trade or business. However, a review of each agreement shows that Com Squared was in complete control of the CAR project from the very beginning. We come to this conclusion even though the technology Development Agreement transferred the technology for the CAR to PG V, since the Technology License Agreement and the Technology Option Agreement, which were executed simultaneously with the Technology Development Agreement, in the final analysis, allowed Com Squared to maintain its control over the CAR. The Technology Development Agreement provides that Com Squared was responsible for any development costs in excess of $ 450,000. Com Squared was required to indemnify PG V against all damages, costs, and expenses as a result of patent or trade secret or trade mark infringement actions on account of the manufacture and sale of the technology covered by their agreement to develop the CAR. Such responsibilities are *298 not those of a licensee, but of the owner of the ultimate product. In addition, the option agreement gave Com Squared the ability to maintain its control over the CAR. Looking at each step of the transaction between Com Squared and PG V leads to the conclusion that PG V made an investment in the CAR so that the necessary research could be completed by Com Squared in exchange for a royalty interest of 10 percent of the revenue from the sale of the technology. Since PG V's sole role was to contribute capital for the development of the CAR in exchange for the royalty interest, PG V was involved as an investor and was not carrying on a trade or business. Spellman v. Commissioner, supra.
We disagree with petitioner's claims that the agreements should be read independently and that each agreement reflects the true nature of the transactions between Com Squared and PGA. First, petitioner asserts that both PGA and Com Squared were involved with the original concept of the CAR and that Com Squared sold its interest to PG V. However, there was no economic reason for Com Squared to sell its interest for $ 35,000 when Halleen intended to market the CAR for Com Squared's *299 benefit. It is clear that this first "sale" was a device merely intended to give PG V the appearance of ownership. These transactions hardly constitute the transfer by Com Squared of all substantial rights in the CAR. Second, if, as petitioner claims, PGA and Com Squared began with equal rights in the CAR they might well have formed a joint venture whereby Com Squared would perform research and PGA would provide capital. On this basis both parties would then have owned the research, shared the profits and been entitled to a portion of the section 174 deductions. However, under the agreements, Com Squared retained 90 percent of the revenues and PGA received all of the section 174 deductions plus 10 percent of the revenues. Such a small interest in profits indicates that PGA did not have equal rights in the CAR. Further, because Com Squared could not have benefitted from the section 174 deductions during 1982, because of its substantial net operating losses, we are not surprised to find all of the deductions were transferred to PGA. In essence, PGA merely received the section 174 deductions and 10-percent royalty in exchange for a contribution of capital to the venture. *300 Third, the terms of the Option Agreement belie petitioner's claim that PG V purchased the CAR. If PG V actually owned the CAR we would expect that PGA would have sold its rights for a reasonable amount. However, the Option Agreement does not even attempt to relate the purchase price of the CAR to its fair market value at the time of sale. Instead, PG V received a small cash payment of $ 6,000 and the right to continue to receive the 10 percent royalty interest. The fact that PG V received the same amount for selling the actual product as it did for licensing an interest in the CAR before it was developed indicates that PG V did not retain a controlling interest once the original documents were executed. It is apparent that PG V could not have purchased the CAR without agreeing to the Option Agreement. Further, it is obvious that the Option Agreement was merely part of a plan to reward PGA with substantial income tax deductions in exchange for a contribution of risk capital. Again, PGA's role was always limited to that of an investor. Petitioner contends that since Com Squared could not assign its rights under the Option Agreement without PG V's approval this fact shows that *301 the PG V had control over the CAR. We disagree since PG V would insist on this right to protect its 10-percent royalty interest. Finally, we are not persuaded by petitioner's claim that Siqveland's active role in the CAR project demonstrates that PG V was engaged in a trade or business. The management of investments is not a trade or business irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner,312 U.S. 212 (1941). Although Siqveland devoted substantial energy to various aspects of the CAR project, that activity could not bring PG V a larger proprietary interest than the 10-percent royalty interest. Because PG V's interest in the CAR was limited to that of an investor who provided risk capital, PG V was not engaged in a trade or business with respect to the CAR and is not entitled to the deductions claimed section 174. Decision will be entered for the respondent.
Footnotes
1. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. As described below, petitioner claims losses as both a general partner and a limited partner. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. ↩
4. The royalty did not apply with respect to sales of certain additional hardware or software developed by Com Squared, or to any units sold for use with a Univac 1100 Series computer. ↩