William V. SCOGGINS; Joyce M. Scoggins; Robert W. Christensen; Carrie L. Christensen, Petitioners–Appellants,

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee.**

No. 91–70696.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1993.

Submission Deferred May 13, 1993.

Resubmitted Jan. 25, 1995.

Decided Feb. 1, 1995.

John F. Hopkins and Jennifer M. Cunneen, Hopkins & Carley, San Jose, CA, for petitioners-appellants.

Gary R. Allen, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee.

Before: GOODWIN, HUG, and FLETCHER, Circuit Judges.

HUG, Circuit Judge:

This case presents the question of whether research expenditures made by a partnership, that was formed in order to develop new technology, were incurred in connection with the partnership's trade or business, so as to be deductible expenses under 26 U.S.C. § 174. William Scoggins and Robert Christensen were the sole partners in the partnership. They also formed a corporation in which they held the majority interest. The partnership contracted with the corporation to do the research to develop the new technology, but the partnership retained ownership of any technology developed. The partnership agreed to pay to the corporation up to $500,000 to do the research and, in addition, gave the corporation a nonexclusive license to market the technology for a 15–month period and also an option to acquire the technology for $5 million after the license expired.

The Tax Court held that the partnership was not entitled to claim the $486,000 it expended for the research during the 1985 and 1986 tax years. It upheld the deficiencies the Commissioner of Internal Revenue ("Commissioner") assessed against the two partners and the penalties assessed for substantial underpayment of tax under 26 U.S.C. § 6661.[1]

We have jurisdiction over this timely appeal pursuant to 26 U.S.C. § 7482, and we reverse.

### I.

William Scoggins and Robert Christensen have been in the business of designing, manufacturing, and operating epitaxial reactors since 1972. An epitaxial reactor is a machine used in the high-technology industry to apply layers of silicon on substrate silicon wafers in accordance with customer specifications. Scoggins and Christensen had formed various business entities that had researched and developed an epitaxial reactor that they invented. That product was marketed for about 1½ years and then Scoggins and Christensen sold the business for about $3 million. Pursuant to a covenant not to compete in sales transactions, Scoggins and Christensen did not undertake any significant developments in reactor technology for three years.

After the expiration of the three-year period, Scoggins and Christensen began to develop technology for a new type of epitaxial reactor. In August of 1984, Scoggins and Christensen formed the B & B Research and Development Partnership ("the partnership"). The partnership agreement specified that "the purpose of the partnership is to engage in the business, research, and development of semiconductor equipment and to do all things related to, incidental to, or in furtherance of such purpose, and to engage in any other business as the general partners may deem appropriate."

About two months before, Scoggins and Christensen had formed a corporation entitled Epitaxy Systems, Inc., ("the corporation") for the purpose of providing research and experimentation services on a contract basis. Scoggins and Christensen together owned 75% of the corporation's stock. In August of 1984, the partnership executed a research and development agreement with the corporation under the terms of which the partnership engaged the corporation to perform certain research, development, and technical work toward developing the new epitaxial reactor. Under the agreement, the corporation agreed to use its best and reasonable efforts to research and develop a new epitaxial reactor. The partnership agreed to provide the corporation with up to $500,000, consisting of $43,000 to be paid upon the execution of the agreement and additional amounts to be paid at the partnership's discretion, as necessary, to complete the research. In addition to the monetary compensation, the partnership granted the corporation a 15–month nonexclusive license and thereafter an option to purchase the rights to the technology for $5 million. The nonexclusive license allowed the corporation to use and sell the technology throughout the entire world in exchange for a 20% royalty to

---

**1.** Joyce M. Scoggins and Carrie L. Christensen are parties to this appeal solely by virtue of having filed joint tax returns for the years at issue with William Scoggins and Robert Christensen.

be paid to the partnership. The option to purchase the technology provided that the corporation had one year, beginning 18 months after the technology was finally developed, in which it could purchase all the rights to the technology for $5 million. At least $1 million was to be paid in cash and the rest by a promissory note secured by the research project with interest at the rate of 110% of the applicable imputed interest rate periodically established pursuant to the Internal Revenue Code. Any licenses granted by the partnership to others were to be subject to the corporation's option.

■ On its partnership information returns for 1985 and 1986, the partnership reported $290,000 and $196,000, respectively, as deductible research and experimentation expenditures under 26 U.S.C. § 174(a)(1). As partners, appellants claimed their distributive share of these expenditures as pass-through deductions on their personal income tax returns for those years. Under general principles of partnership and taxation law, a partnership does not, itself, pay taxes. Instead, the partners claim a pro-rata share of the partnership's profits and losses and each pays tax on his share. *See Kantor v. Commissioner,* 998 F.2d 1514, 1517 n. 1 (9th Cir.1993).

The Commissioner disallowed appellants' deductions, determined a deficiency in their income taxes for 1985 and 1986, and added penalties for negligence and substantial understatement of tax liability. The Scogginses' combined deficiency for both years totalled $175,448. The Christensens' combined deficiency totalled $176,705. The Commissioner did not dispute that the partnership's expenditures were incurred for research and experimentation or that the enterprise was motivated by a genuine profit motive. Instead, the Commissioner determined that the partnership could not have incurred the expenditures in connection with its own trade or business, as required by section 174(a)(1).

■ After a consolidated trial, the Tax Court upheld the Commissioner's disallowance of appellants' deductions and the Commissioner's additions to tax for substantial underpayment, but reversed the negligence penalties. The Tax Court concluded that the partnership did not have a realistic prospect of exploiting the technology in a business of its own. Instead, the court determined that the partnership was only the investment vehicle for technology developed by the corporation which would likely be exploited, if at all, by the corporation. We review the Tax Court's findings of fact under the "clearly erroneous" standard. *Allen v. CIR,* 925 F.2d 348, 353 (9th Cir.1991). But the Tax Court's ultimate determination that the partnership's expenditures were not "research or experimental expenditures ... in connection with [a] trade or business" involves the application of law to fact, and calls for *de novo* review by this court. *See Zink v. United States,* 929 F.2d 1015, 1020–21 (5th Cir.1991). We conclude that the Tax Court erred in denying Scoggins and Christensen their research expenditure deductions under section 174.

## II.

Section 174(a)(1) of the Internal Revenue Code allows a taxpayer to deduct from income "research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business." Treasury Regulation § 1.174–2(a)(2) further provides that a taxpayer may deduct these expenses even when the research is "carried on in his behalf by another person or organization...."

In *Kantor,* we construed section 174 of the Internal Revenue Code in connection with a partnership that sought to deduct research expenditures made in connection with the development of new technology. We noted that in 1974 the Supreme Court held that section 174 deductions were available to "up-and-coming enterprises whose only 'business' at the time they incur research expenditures is the research itself." 998 F.2d at 1518 (citing *Snow v. Commissioner,* 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974)). We noted that the Supreme Court had concluded that section 174 was intended to modify the more restrictive provisions of section 162 "by providing new businesses, which are not yet selling goods or services, an immediate deduction for research and experimental expenditures." *Id.* However, as we held in *Kan-*

*tor,* "[a]lthough a taxpayer need not be conducting a trade or business at the time it incurs the research expenditure, the taxpayer must demonstrate a 'realistic prospect' of subsequently entering its own business in connection with the fruits of the research, assuming that the research is successful." *Id.* We held that a taxpayer demonstrates such a prospect by "manifesting both the objective intent to enter such a business and the capability of doing so." *Id.*

### III.

■ Scoggins and Christensen owned the partnership and had the controlling interest in the corporation. They had previously developed an epitaxial reactor and had successfully marketed it. They had invented a new type of "pancake-heated" epitaxial reactor and contributed to the partnership all the technology associated with the design and production of that product. They decided to contract with the corporation to do the research necessary to develop the technology into a marketable product. The corporation obviously affords limited liability to its shareholders in conducting its operations. The partnership expended $486,000 of the funds contributed by Scoggins and Christensen to pay for the corporation to do the research. That research was done under the guidance of Scoggins and Christensen with the assistance of three corporate employees. There is no question that Scoggins and Christensen had the objective intent to enter into the business of marketing the reactor if the reactor proved successful. The only question is whether they had a realistic prospect of engaging in the business as a partnership, or whether by virtue of the agreement with the corporation, they had deprived the partnership of the capability of doing so.

It is apparent that the two partners had the technical expertise to market the reactor. They were the inventors and designers of this reactor, and they had developed the business that had marketed their first reactor. They had evidenced the financial ability to conduct the business. Under the agreement, they had the right to market the product for 18 months and for an indefinite time if the corporation they controlled did not

purchase the technology for $5 million within one year thereafter. It is possible that the corporation would find it economical to pay the $5 million to purchase the technology and pay the 20% royalty to the partnership if the research turned out to be successful; however, it had to be successful enough for the corporation to amortize the purchase price and pay the royalty.

It is worth noting that even the 15–month nonexclusive license given to the corporation was permissive; the corporation made no commitment to market the product. The partnership owned the technology and had the indefeasible right to market it either itself or through others for 18 months (3 months longer than the corporation). It had the indefinite right to market the product unless the corporation exercised its option to buy the technology after the first 18 months for $5 million.

We conclude that Scoggins and Christensen, through the partnership, had both the objective intent to enter the business and the capability of doing so. The possibility that the corporation could choose to buy out the technology did not vitiate either the objective intent or the capability of the partnership entering the business of marketing the reactor.

### IV.

Our opinion in *Kantor* had not been published at the time of the Tax Court decision. However, the Tax Court correctly identified the relevant inquiry as being "whether the partnership had realistic prospects of engaging in a trade or business." The Tax Court concluded it did not. The historical facts relevant to this inquiry are not in dispute. The conclusion of the Tax Court is based largely upon the terms of the agreement between the partnership and the corporation, the fact that the partnership did not have office furniture, telephones, or employees, and the fact that it had made no effort during 1984 or 1985 to market the technology to other licensees.

We examine the facts relied upon by the Tax Court and the conclusions reached.

## 1. TERMS OF THE AGREEMENT

The focus of the Tax Court's conclusion, based on the terms of the agreement, is summarized by the following paragraph of the opinion.

Pursuant to the R & D Agreement B & B ("the partnership") had given substantial rights to the technology to Systems ("research corporation") in exchange for a 20% royalty fee. What it had left it gave Systems an option to buy. Thus, B & B had contractually precluded itself from engaging in any trade or business.

The facts are that the agreement gave to the corporation a *nonexclusive* license to sell the technology for the limited period of 15 months. The corporation was required to pay the partnership a 20% royalty on the net sales revenue received for sales made during the 15-month period. The partnership could market the technology during this 15-month period without paying a royalty or it could engage others to market the technology.

During this 15-month period, the partnership was actually in a better financial position than the corporation to market the product because it would not have the 20% royalty taken off the top of the net sales revenue. The option to purchase the technology was not available until the end of the 15-month nonexclusive license period plus an additional three months (during which the corporation's license would have expired but before the corporation could exercise its option). After this 18-month period expired, the corporation had one year in which to decide whether to exercise the option. During that year, the corporation had no right to sell the product, while the partnership, as the owner of the technology, had the continuing right to do so.

As a practical matter, in order to remain in the business of selling the epitaxial reactor, the corporation had to exercise the option immediately after the 18-month period and pay to the partnership the $5 million purchase price for the technology. In deciding to do so, the corporation would have to be able to determine that the potential sales would justify amortizing the $5 million acquisition price plus a 20% royalty on net sales.

## 2. OFFICE EQUIPMENT AND TELEPHONES

The Tax Court placed some emphasis upon the fact that the partnership did not have office equipment or telephones. This certainly is not remarkable, in that until the technology had been developed into a marketable product, there was no need for office equipment or telephones. This is the very situation that was envisioned by the enactment of section 174 and the interpretation placed upon it by the Supreme Court in *Snow*. The idea behind section 174 is to encourage research and experimentation by small, new enterprises and to place them on an equal footing with established businesses, which may deduct under section 162(a) the expenses incurred while carrying on a trade or business. Consequently, taxpayers whose only "business" at the time they incur the research expenditures is the research itself are eligible for the expense deduction under section 174. *Kantor*, 998 F.2d at 1518. Thus, while new businesses must capitalize their "start-up" or "preoperational" expenses because they are not deductible under section 162, section 174 alters this requirement by permitting new, pioneering businesses, which are not yet selling goods or services, to deduct immediately expenditures incurred for research and experimentation.

## 3. NO EMPLOYEES

An additional justification by the Tax Court was that the partnership had no employees that could engage in the business once the technology was developed. The corporation had three employees and, in addition, had the guidance and expertise of the two partners. The partnership had the two key personnel—Scoggins and Christensen—the inventors of the epitaxial reactor and the persons most knowledgeable about the technology itself. These two partners were obviously in a position in the partnership to employ whatever marketing, manufacturing, or other personnel that would be necessary to place the product on the market. Scoggins, Christensen, and the three research employees in the corporation would be in no better position, from an employee standpoint,

to market the product than would the partnership.

This partnership situation differed significantly from other frequently encountered situations where the partnership is composed entirely of investors with no expertise in the product that is to be developed. Here, this partnership was made up of the two persons who were the most intimately involved in the development of the epitaxial reactor.

### 4. NO EFFORT TO LICENSE THE TECHNOLOGY

The Tax Court placed some emphasis upon the fact that the partnership had not, as of 1984 or 1985, made attempts to license the technology to others as they could under their agreement. This is unremarkable, in that the technology had not, as yet, been developed and there would be serious difficulties and competitive risks in marketing an epitaxial reactor that had not been fully developed.

### V.

It is important to contrast the factual situation involved in this case with that which was involved in the *Kantor* case. The partnership involved in *Kantor* was composed entirely of investors with the exception of one person who was knowledgeable about the computer software product that was sought to be developed. The research and development contract was made with a completely independent research corporation with royalty payments to be made to the partnership. In that case, although the partnership had retained ownership of a technology to be developed, it had given the independent research corporation an option to acquire exclusive licensee rights to the technology for the nominal sum of $5,000. It is clear that the $5,000-option price was nominal in comparison to the $3.15 million research expenditure that had been advanced by the partnership. In the *Kantor* case, the contractual arrangement made it unrealistic to conclude that if the $3.15 million expended in research were successful in producing a marketable product, the research corporation would not expend the $5,000 to obtain the exclusive licensing rights. In striking contrast, in this case the research expenditures by this partnership were to be $500,000 and the exclusive rights to the technology could not be obtained without paying $5 million. This was not a nominal acquisition price in comparison to the research cost, and the $5 million was a significant impediment to the corporation's ability to engage in the business of marketing the technology. In *Kantor,* on the other hand, it was virtually certain that the research firm would acquire the technology for the nominal $5,000 figure if the research was successful.

A further distinction is that in *Kantor* if the research firm paid $5,000 it was immediately entitled to market the product exclusively. The partnership had no initial 18-month period in which it could market the product as in the case now before us.

The contrast of the composition of the two entities involved in each case is also significant. In *Kantor,* the partnership contracted with a completely independent research firm. Although the general partner, Hubert, monitored the research, neither he nor the partnership had any ownership or official position in the research firm. In this case, the partnership and the corporation were both controlled and financed by Scoggins and Christensen. It was these partners who would have to be willing to raise $5 million on behalf of the corporation in order for the corporation to be able to continue to market the reactor after the 15-month nonexclusive license expired. The partnership could proceed before and after the 15-month period without raising this capital or paying any royalty.

### VI.

Scoggins and Christensen were actively involved in the development of the technology as partners. Indeed, of all those working on the project, they probably had the most technical knowledge and experience with the technology. Christensen owned his own equipment which was available to the partnership should the partnership need it. On behalf of the partnership, the partners directed and guided the research of the corporation. They invented the technology, di-

rected the research, kept their own records, expended $500,000 of their personal funds on the experimentation, and were involved on a daily basis in the progress of the technology. Scoggins and Christensen, through their partnership, are among the class of taxpayers Congress intended to encourage and reward by enacting section 174.

## VII.

Based upon the undisputed facts of this case, we conclude that the partnership had a realistic prospect of subsequently entering into its own business in connection with the fruits of the research if the research was successful. The partnership's contractual arrangements and activities indicated both an objective intent and the capability to enter such business. The taxpayers' deductions under section 174 were properly taken.

**REVERSED.**