**F I L E D**
United States Court of Appeals
Tenth Circuit

**SEP 8 1997**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LDL RESEARCH & DEVELOPMENT
II, LTD., a limited partnership;
ENSIGN MANAGEMENT GROUP,
INC. And TAX MATTERS
PARTNER,

     Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

     Respondent - Appellee.

No. 95-9014

---

**Appeal from the United States Tax Court
for the Commissioner of Internal Revenue
(D.C. No. 19566-91)**

---

David C. Wright of Kruse, Landa & Maycock, L.L.C., Salt Lake City, Utah for
the Petitioner - Appellant LDL Research & Development.

Annette M. Wietecha (Ann B. Durney with her on the brief), Department of
Justice, Washington, D.C. for the Respondent - Appellee.

---

Before **SEYMOUR**, **LOGAN** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Section 174(a) of the Internal Revenue Code allows "[a] taxpayer [to] treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." In this case we are required to determine when a partnership's expenditures made to third parties to engage in research are "in connection with [the partnership's] trade or business" and consequently deductible as current expenses pursuant to 26 U.S.C. § 174(a).[1]

## I

At issue in the present case are three claimed deductions made by a Utah limited partnership, LDL Research and Development II ("LDL II"), for research and development expenditures paid to a Utah corporation, Larson-Davis Laboratories ("Larson-Davis"). The deductions were claimed on LDL II's tax returns for 1983, 1984, and 1985, and total some $1,111,210. Larson-Davis was founded in 1981 by two engineers, Brian Larson and Larry Davis, to research,

---

[1]In the absence of § 174(a)(1), research expenditures would not be deductible as current expenses because they are capital in nature, i.e. they yield benefits over a period of time rather than when incurred. See Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988). See also William Natbony, The Tax Incentives for Research and Development: An Analysis and a Proposal, 76 Geo. L.J. 347, 348 (1987) ("Without section 174, research and experimental expenditures would be capitalized into the cost of the resulting developed technology and recovered for tax purposes only as the developed technology was depreciated or amortized.").

develop, manufacture, and market acoustic and vibration testing electronic equipment. Both Larson and Davis had extensive prior experience in these areas of expertise. In contrast, the general partners of LDL II had only minimal experience in researching, developing, manufacturing and marketing such equipment.[2]

In November 1983, Larson-Davis concluded a number of written agreements with LDL II, including a "Development Agreement," "Cross-License Option Agreement," and "Purchase Option Agreement." Under the terms of the Development Agreement, LDL-II was to pay Larson-Davis $975,000 in three annual installments in return for Larson-Davis developing various electronic testing devices. Larson-Davis was to send LDL-II monthly and quarterly reports regarding the status of research and development of the devices. Under the Development Agreement, which was to terminate on the earlier of October 1, 1986 or the date the devices were ready for commercial production, LDL-II would be the exclusive owner of the technology developed by Larson-Davis.

While the Development Agreement suggests LDL-II would own the resulting technology, the other agreements indicate that its ownership was not

---

[2]Originally, the managing general partner of LDL II was CFS Properties, Inc., a Utah corporation that specialized in sponsoring real estate limited partnerships. In 1986, CFS Properties was replaced as managing general partner by Ensign Management Group, Inc.

absolute. Under the terms of the Cross-License Option Agreement, Larson-Davis held an option on a non-exclusive license to manufacture and market developed devices for 14 months. If the option were exercised, LDL-II would receive a 12% royalty fee. Finally, under the terms of the Purchase Option Agreement, Larson-Davis held an option to buy all rights in the technology outright from LDL-II. If exercised, LDL-II would receive a 15% royalty fee up to a total of $6.35 million. At that point, Larson-Davis would transfer 5% of its stock to LDL-II.[3] All rights in the technology were to pass to Larson-Davis at the time the Purchase Option was exercised.

Simultaneous with these agreements, LDL-II published a "Private Placement Memorandum" (or "PPM") designed to attract investors to the partnership. The PPM stated that Larson-Davis would research, develop, manufacture and market two specific electronic devices. The PPM further stated that the general partners of LDL-II were not significantly experienced in

---

[3]LDL-II and Larson-Davis concluded two other written agreements: a "Development License" and a "Use License Option Agreement." Under the Development License, LDL-II paid Larson-Davis $25,000 to use the latter's existing "base" technology in the research and development of the proposed devices. This nonexclusive license was to terminate at the same time as the Development Agreement. Under the Use License Option Agreement, LDL-II held an option to acquire a nonexclusive license to Larson-Davis's base technology following the termination of the Development License. If the option were exercised, LDL-II would pay Larson-Davis 0.25% of revenue from sales of products incorporating the base technology as a royalty fee up to a total of $80,000.

researching, developing, manufacturing, or marketing such devices, and that LDL-II had done no study on the marketability of the proposed devices. By the terms of the PPM, LDL's limited partners would obtain tax benefits from 1983 to 1985 as § 174(a) deductions reported by LDL II were passed through to investors. Limited partners would also have the prospect of cash distributions from 1986 onward. The PPM anticipated that a total of $1,905,300 in capital would be raised, principally from the sale of limited partnership units and promissory notes. Some $975,000 would be paid to Larson-Davis by the terms of the Development Agreement, while $905,000 would go to LDL-II for salaries, administrative costs, and interest payments on the promissory notes, and $139,149 would be held as a cash reserve. The limited partnership shares sold would allow LDL II to raise a further $224,000 from its limited partners as needed.

In 1985, Larson-Davis developed the "Series 3100 Real Time Analyzer" (the "3100"), which performed the functions of both electronic devices described in the PPM and Development Agreement. In April 1986, LDL-II exercised its option under the Use License Option Agreement. In October of that same year, Larson-Davis exercised its option under the Cross License Option Agreement to market and manufacture the 3100. In November 1987, LDL-II and Larson-Davis entered into a Memorandum of Agreement that extended the terms of the Cross License Option Agreement for a further five months. Though it appears that

Larson-Davis never formally exercised its rights under the Purchase Option Agreement, Larson-Davis paid LDL-II the higher 15% royalty fee from June 1988. In total, Larson-Davis paid LDL-II some $236,196 in royalties between 1986 and 1989. Thereafter, sales of the 3100 declined. Because Larson-Davis apparently never exercised its option under the Purchase Option Agreement, LDL-II continues to hold the rights to market and manufacture the 3100. However, it has never pursued these rights.

Following an audit, the Internal Revenue Service disallowed the deductions on grounds that LDL-II was not engaged in a trade or business in connection with the research and development expenditures made to Larson-Davis. LDL-II challenged the Commissioner's ruling in the United States Tax Court. When judgment was entered for the Commissioner, LDL-II appealed to this court. We exercise jurisdiction pursuant to 26 U.S.C. § 7482. We conclude that the tax court properly denied the deductions claimed by the partnership.

## II

A taxpayer's research and development expenditures are deductible under § 174(a) only if they are incurred in connection with the taxpayer's trade or business. Nickeson v. Commissioner, 962 F.2d 973, 976 (10th Cir. 1992). The taxpayer has the burden of proving that amounts deducted are spent for qualified research and experimental expenditures. Lisa Fagan et al., Mertens Law of

Federal Income Taxation, § 25.95, at 260. We determine the availability of a deduction pursuant to § 174(a), first, by making "an initial inquiry into whether the activity was undertaken or continued in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income therefrom." Nickeson, 962 F.2d at 976 (internal quotations omitted). In this case, the Commissioner has conceded that LDL-II's payment of research and development expenditures to Larson-Davis had a bona fide profit motive and was not made merely to reap tax benefits.

To claim a deduction, LDL-II need not carry out any actual research. The Commissioner has interpreted § 174(a)(1) to allow deductions to be taken

> not only [for] costs paid or incurred by the taxpayer for research and experimentation undertaken directly by him but also for expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor).

Treas. Reg. § 1.174-2(a)(2). Neither the Internal Revenue Code nor Treasury regulations defines "in connection with the taxpayer's trade or business" more specifically.

In this circuit, research expenditures are made "in connection with" the partnership's trade or business if the taxpayer is "actively involved in the [research project] as a trade or business." Nickeson, 962 F.2d at 978. Other circuits also allow research expenditures to be deducted under § 174 if a taxpayer

has a "realistic prospect" of such involvement. See Spellman, 845 F.2d at 149. LDL-II claims to satisfy either the "active involvement" or "realistic prospect" tests. The Commissioner disputes both contentions.

In this case, the Tax Court ruled that LDL-II was neither actively engaged in a trade or business nor had a realistic prospect of being so. Its basis for concluding that LDL-II was not actively engaged in a trade or business was the partnership's lack of control over the activities of Larson-Davis. The former could only insist that Larson-Davis spend the $975,000 on 3100 research, and provide the partnership with progress reports. LDL-II's actual activities were limited to "ministerial" functions such as "filing tax returns, receiving status reports from [Larson-Davis], and informing investors of the status of the research, development, manufacture, and marketing of the electronic devices." Tx. Ct. at 16.

The Tax Court also concluded that LDL-II lacked a realistic prospect of engaging in a trade or business in connection with the 3100 technology. First, compared to the principals of Larson-Davis, LDL-II had little or no experience in the research, development, manufacture, and marketing of electronic devices. Second, the written documents made clear that LDL-II was in fact relying on Larson-Davis to perform all these functions; whatever rights LDL-II retained to manufacture or market the devices were purely theoretic. LDL-II had no plans in

place to market and manufacture the devices should Larson-Davis not exercise its options to do so.  Thus, there was only a "mere possibility" that LDL-II would enter the relevant trade or business.  See Tx. Ct. at 19.  Third, LDL-II lacked the capital and employees necessary to market and manufacture the 3100.  Accordingly, the Tax Court regarded LDL-II as a passive investor and unentitled to the deductions claimed.

LDL-II believes that the Tax Court erred in crediting the "form" of its relationship with Larson-Davis over its actual "substance."  According to LDL-II, the latter should control the tax consequences of their deal with Larson-Davis.  LDL-II also contends that because the Commissioner conceded the partnership had a profit motive, it must have been more than a passive investor in Larson-Davis.  Both arguments fit within LDL-II's contention that its day-to-day activities in connection with the 3100 project demonstrate entitlement to the § 174(a)(1) deductions because LDL-II was actively engaged in a "trade or business" as required by the statute.

We review the Tax Court's factual findings under the clearly erroneous standard and purely legal questions de novo.  26 U.S.C. § 7482(a); Hawkins v. Commissioner, 86 F.3d 982, 986 (10th Cir. 1996).  That court's "ultimate determination that the partnership's expenditures were not 'research or experimental expenditures . . . in connection with [a] trade or business' involves

the application of law to fact, and calls for de novo review by this court." Scoggins v. Commissioner, 46 F.3d 950, 952 (9th Cir. 1995). We therefore reject the Commissioner's contention that we should review the ultimate facts of this case—whether the taxpayer satisfied either the active involvement or realistic prospect tests—under a clear error standard.

### III

### A

To be actively involved in the 3100 project as a trade or business, LDL-II must be more than a passive investor in the 3100 project. See Nickeson, 962 F.2d at 978. We have not definitively established the boundary between passive investment and active involvement. In Nickeson, we relied on Zink, 929 F.2d at 1021, Higgins, 312 U.S. at 218, Snyder v. United States, 674 F.2d 1359, 1364 (10th Cir. 1982), Levin v. Commissioner, 832 F.2d 403, 406 (7th Cir. 1987), and Diamond v. Commissioner, 930 F.2d 372, 376 (4th Cir. 1991). See Nickeson, 962 F.2d at 978. In those cases, the primary determinant between involvement and investment was the degree of taxpayer control over, or regular and substantial participation in, the project in question. See id. (to claim § 174(a)(1) deduction, taxpayer "must show . . . that their activities were substantial and regular enough to establish that they were actively involved in the trade or business"); Zink, 929 F.2d at 1022 ("The lack of control over the activities in which [taxpayers]

invested leads to the conclusion that they were merely investors."); Diamond, 930 F.2d at 376 (taxpayer lacking control over project in which it invests, and without "a say in [its] affairs," properly classified as investor); Levin, 832 F.2d at 406 (where taxpayer "dominated" by researching entity and "had no independent expertise in the . . . business," Tax Court permissibly concluded investor only).

The Tax Court's conclusion that LDL-II's involvement in the project at the time the deductions were claimed was insufficient to justify the deductions claimed under the active involvement test is based on the factual finding that LDL-II's on-going activities toward the project during the years in question were limited to "filing tax returns, receiving status reports from the Lab [i.e. Larson-Davis], and informing investors of the status of the research, development, manufacture, and marketing of the electronic devices."[4]  Tx. Ct. at 16.  Noting the

---

[4]The partnership argues that accepting the Commissioner's stipulation that the R&D project was carried on with a profit motive is itself sufficient to prove that its activities were in connection with an active engagement in a trade or business.  It is true that in determining whether a taxpayer has a profit motive, courts may consider a large number of factors, including the question of whether the taxpayer is merely a passive investor.  See Nickeson, 972 F.2d at 973, citing Diamond v. Commissioner, 930 F.2d 372, 376 (4th Cir. 1991).  But the presence of a profit motive cannot establish that LDL-II was ever more than a passive investor.  As Nickeson makes clear, the taxpayer must show a profit motive and substantial activities demonstrating active engagement.  There would be no point to this two-step analysis if the latter step flowed from the former as a matter of course.  See Nickeson, 962 F.2d at 978; see also Zink, 929 F.2d at 1021 ("Obviously, establishment of the requisite profit motive alone does not satisfy section 174); Harris v. Commissioner, 16 F.3d 75, 80 (5th Cir. 1994) (same).  Active engagement ensures that the expenditures are made in connection with the taxpayer's trade or business.  See § 174(a).

partnership's agreements with Larson-Davis, the Tax Court found that the only indicia of LDL-II's control over the 3100 project were its "right . . . to receive reports and the limitation on the Lab [Larson-Davis] in the use of the $ 975,000." Id.

Unless these findings are clearly erroneous, we must affirm the tax court's determination that LDL-II was not actively engaged in the 3100 project. Appellant argues that many of the Tax Court's factual findings proceed from erroneously elevating the "form" of the relationship between LDL-II and Larson-Davis above its "substance." Appellant views the written agreements between itself and Larson-Davis as the "form" of their relationship. The true substance of that relationship, appellant contends, is revealed in unrebutted oral testimony given at trial by CFS employees who worked for LDL-II and by employees of Larson-Davis who were familiar with the interactions between the two firms. This testimony allegedly indicates that LDL-II exercised a far greater degree of

---

Of course, where a taxpayer has not contracted out the research portion of a production process, the concession of profit motive will a fortiori entitle it to deduct the costs of its research expenditures pursuant to § 174(a)(1). So long as the resultant technology is intended for commercial exploitation of some kind, then the taxpayer's research costs are presumptively expended in connection with its trade or business. In such a case, the taxpayer's "active involvement" in the research project will usually be readily established. The present dispute, by contrast, involves a taxpayer who chose to contract out the research work involved. In such a case, the question to be resolved is whether the taxpayer's other connections to the work performed are sufficient to establish "active involvement."

control over Larson-Davis and was far more actively engaged in connection with the 3100 business than the Tax Court found on the basis of the formal relationship between the two.

LDL-II incorrectly characterizes the basis of the Tax Court's factual findings. A close reading of the decision below reveals that the lower court credited the "form" of the relationship over what appellants view as its substance only inasmuch as it perceived the written agreements between Larson-Davis and LDL-II to be more revealing of the true substance of the relationship than the oral testimony presented at trial. The Tax Court explicitly recognized that to determine the taxpayer's entitlement to a deduction under § 174(a)(1), "all of the surrounding facts and circumstances are relevant." Tx. Ct. at 13. Moreover, it expressly found the oral testimony offered by LDL-II at trial to be "vague," and concluded that the appellant had failed to produce "documentary evidence or other credible testimony that would indicate that the general partners of LDL exercised any significant direction or control over the Lab." Id. at 17 (emphasis added).

"If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the

factfinder's choice between them cannot be clearly erroneous."  Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985); see also id. at 575 ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings.").  Reviewing the testimony offered, we conclude that the tax court's decision to credit the substance of the relationship as established by the written agreements between LDL-II and Larson-Davis, and by the PPM, was not clearly erroneous.

Applying the facts to the law, the right to receive reports and monitor the use of the contributed funds cannot render LDL-II actively involved in the electronic acoustic testing equipment business.  To suppose otherwise would mean that a "bond debenture entitling the debenture trustee to inspect the books and plants of the corporation issuing the bonds would make the bondholders joint venturers with the corporation."  Spellman, 845 F.2d at 151.  At least as to a start-up R&D partnership, the right to require contributed funds to be spent on a specified research project cannot establish active involvement in a trade or business.  Such funding may constitute the R&D partnership's initial steps into the trade or business in question—but that will only be the case where the partnership will ultimately control the commercial exploitation of the fruits of the research.  If the partnership will not exercise such control, then the initial research funding will be merely a passive investment in a specific research

project.  Ear-marking funding cannot, without more, establish active involvement in a trade or business.  That is the case regardless of whether LDL-II expended energy and resources in determining which research project should receive its prospective investment.  Managing investments, no matter how time-consuming or lucrative, does not constitute a trade or business.  See Higgins v. Commissioner, 312 U.S. at 218; Zink v. United States, 929 F.2d 1015, 1021 (5th Cir. 1991) (citing Higgins, 312 U.S. at 218; Whipple v. Commissioner, 373 U.S. 193, 202 (1963)); but see Commissioner v. Groetzinger, 480 U.S. 23, 35-36 (1987) (full time professional gambler engaged in trade or business).

Supreme Court precedent strongly suggests that any non-financial contributions LDL-II may have provided Larson-Davis would not in and of themselves establish LDL-II's active involvement in the 3100 trade or business. In Whipple, the Supreme Court stated:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation.

- 15 -

373 U.S. at 202. Of course, LDL-II might have provided certain services to Larson-Davis for purposes other than protecting its pre-existing investment in the 3100 company. For instance, the two firms might have negotiated for LDL-II to have provided such services for compensation separate from return on investment. If that were the case, then LDL-II might be able to establish its services were provided in connection with a trade or business, see id. at 202-03, and leave open the possibility that its research expenditures would be deductible. However, the written agreements between Larson-Davis and LDL-II provide no indication whatever that LDL-II was expected or required to provide anything more than research funds. Even the oral testimony offered by LDL-II—discounted though it was by the Tax Court—does not suggest that LDL-II's legal, accounting, or other business services were factored into the overall bargain negotiated between the two concerns. Thus, even if Larson-Davis came to rely on LDL-II for such services, there is no record to support a finding that the partnership was doing more than promoting or protecting its investment. Such is not "active involvement" for the purposes of § 174(a). See, e.g., Kantor, 998 F.2d at 1520 (noting that limited partner's "activities with the research firm on behalf of the partnership were consistent with those of an investor who applies his knowledge and expertise to insure that an investment is successful").

B

Many start-up R&D partnerships that contract out research work will not qualify for § 174(a)(1) deductions under the "active involvement" test. In the years the deductions are claimed, such partnerships will often have too limited a connection to a trade or business to establish the kind of proprietorial control that can validate the deduction of research expenditures under § 174(a)(1). The "realistic prospect" test, which is in effect a specific form of the active engagement test, arises from the Supreme Court's determination that, in order to qualify for a deduction under § 174(a)(1), a taxpayer need not be actively engaged in a trade or business at the time research expenditures are made. See Snow v. Commissioner, 416 U.S. 500, 503-04 (1974). On the basis of legislative history, the Snow Court held that § 174(a)(1) was partly intended to benefit start-up research and development companies. Id. at 503. The Court upheld the deductibility of research expenditures by a taxpayer who had reported no sales during the year for which the deduction was claimed, but whose expectations of entering the market with a developed product were at that time high and, indeed, subsequently realized. Id. at 502-04.

Snow "fairly invited the creation of R&D tax shelters," Spellman, 845 F.2d at 151, and has been interpreted narrowly to require that deducted research and development expenditures be directed at projects with "realistic prospects" of

"developing a new product that will be exploited in a business of the taxpayer," id. at 149. "If those prospects are not realistic, the expenditure cannot be 'in connection with' a business of the taxpayer," who therefore remains merely a passive investor. Id. In light of Snow, a taxpayer demonstrates a "realistic prospect" of entering its own business in connection with the research project, by "manifesting both the objective intent to enter such a business and the capability of doing so." Kantor v. Commissioner, 998 F.2d 1514, 1518 (9th Cir. 1993). Hence, the mere possibility of engaging in a project-connected trade or business does not satisfy the requirements of § 174(a). Id. at 1520; Levin, 832 F.2d at 406-07. By the same token, the bare contractual right to enter such a business does not entitle the taxpayer to a § 174(a)(1) deduction. Rather, the "right question" is "whether the partnership[] reasonably anticipated availing [itself] of the privileges [it] possessed on paper." Levin, 832 F.2d at 406.

Snow does not question an investor's lack of entitlement to § 174 deductions. See Nickeson, 962 F.2d at 978. "Tax law draws a fundamental distinction between engaging in a business of one's own and investing in the business of another." Kantor, 998 F.2d at 1519 (citing Whipple, 373 U.S. at 202; Higgins, 312 U.S. at 218). By its plain language, § 174(a)(1) is limited to expenditures made by the taxpayer in connection with his trade or business. Accordingly, the IRS has consistently and reasonably maintained that investors in

R&D partnerships should receive the same tax treatment as investors in other enterprises, and should not be able to avail themselves of §174(a)(1). Thus, investment risk from a project's potential failure is not enough to confer entitlement to a research deduction under the "realistic prospect" test. Rather, the taxpayer who funds research activities by another party can only claim such a deduction if it will own the results of the research project at its completion, and will thereby accede to the benefits and costs of proprietary control.[5] By assuming an expectation of ownership before the research has been conducted, the taxpayer ensures that its research payments to another party are potentially in connection with its own future trade or business. The question is not wholly determined by ownership because the taxpayer's intended commercial exploitation must still meet the definition of a "trade or business."[6] But unless it assumes a realistic

---

[5]Of course, if the taxpayer has no intention of exploiting for profit the fruits of the research, the deductions claimed will not be in connection with its trade and business. See Boris I. Bittker & Lawrence Lokken, 1 Federal Taxation of Income, Estates and Gifts, ¶ 26.3.1 (2d ed. 1989) ("A fortiori, § 174 does not embrace research conducted as a hobby or any other project not engaged in for profit.").

[6] There remains, for instance, the question of how sustained or regular the taxpayer's commercial exploitation of the fruits of the research must be to constitute a trade or business under § 174(a)(1). Interpreting 26 U.S.C. § 162(a), which allows deductions for "ordinary and necessary business expenses . . . incurred in carrying on any trade or business," the Supreme Court has held that "to be engaged in a trade or business, the taxpayer must be involved in the [income or profit producing] activity with continuity and regularity . . . . A sporadic activity . . . does not qualify." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Snyder, 674 at 1364 (holding that taxpayer must "devote[] sufficient time over a substantial enough period to be in a trade or business under section 162").

expectation of owning the resulting technology for purposes of commercial ownership, the taxpayer's research expenditures will be made in connection with another party's trade or business, and will not be deductible.

The risks of investing in a research endeavor and of assuming its ownership, including the risk associated in carrying on a trade or business from any technology that it may produce, are not readily separable. At the extremes, the differences are apparent. A taxpayer that funds research by another party in return for royalties is clearly no more than an investor making a capital contribution to the trade or business of another. See Spellman, 845 F.2d at 150 (comparing such contributions to the purchase of a share in an oil lease).[7] Conversely, a profit-motivated taxpayer that funds research by another party in return for full ownership of the research results assumes the risks associated with

_____

We express no opinion as to whether this case law is applicable to § 174(a)(1) deductions, and, if so, whether certain forms of commercially exploiting research products might be too irregular or unsustained to constitute a trade or business. We note, however, that the Groetzinger court was careful to observe that any effort to provide an all-purpose definition for "trade or business" applicable to all Code contexts "would be counterproductive, unhelpful, and even somewhat precarious for the overall integrity of the Code." 480 U.S. at 36. We further note that the § 174(a)(1) regulations state that the term, "research . . . expenditures, . . . generally includes all . . . costs incident to the development and improvement of a product," § 1.174-2(a)(1), and that "the term product includes any . . . invention, technique, patent, or similar property, and includes property to be used in its trade or business as well as products to be held for sale, lease, or license," § 1.174-2(a)(2) (emphasis added).

[7]Similarly, a partnership that funds research by buying stock with a future expectation of return in the form of dividends functions as an investment vehicle and is consequently unentitled to § 174 deductions. See Harris, 16 F.3d at 78.

the expectation of ownership. It is accountable for any liabilities generated by the research product, and stands to reap the entire financial benefit of the research project proving successful. Assuming that the taxpayer objectively manifests its intention to exploit the fruits of the research product in an adequately commercial capacity, it presumptively makes the research expenditure in connection with its trade or business.

LDL-II clearly believes that as the stated "owner" of the results of the 3100 research venture, it is entitled to the deductions. Had the partnership simply engaged Larson-Davis to perform certain research, LDL-II would have had an entirely realistic expectation of assuming the full benefits and costs of ownership; all the returns and liabilities of the final product would have been its own. But by granting Larson-Davis the two options contained in the Cross-License and Purchase Option Agreements, LDL-II's expectations of ownership were far different.[8] In effect, the options show that it was Larson-Davis that bargained for an expectation of ownership, thereby assuming the risks and rewards of proprietary control.[9]

[8]Appellant's reliance on cases such as Smith v. Commissioner, 937 F.2d 1089 (6th Cir. 1991) and Goldman v. Commissioner, 55 T.C.M. (CCH) 1490 (1988), is accordingly misplaced. In both Smith and Goldman the partnerships anticipated owning the resulting technology for their own commercial exploitation.

[9] In such circumstances, an R&D partnership can no longer rely on the language of Treas. Reg. § 1.174-2(a)(8), which allows the taxpayer to deduct expenditures incurred for research carried on "in his behalf." See William Natbony, Tax Shelters and Section

Thus, should the completed research have proven marketable, Larson-Davis would likely have exercised its option rights. In return for its earlier financial contributions, LDL-II would have been left with the prospect of royalty returns, a reduced exposure to products liability,[10] and, for the fourteen month period of the Cross-License Agreement, the opportunity to sell non-exclusive, short-term licenses to parties other than Larson-Davis. These are not the indicia of ownership that would indicate a realistic prospect of entering a business in connection with the 3100. Royalty returns on funding a fortiori flow to investors. See Spellman, 845 F.2d at 150. Larson-Davis's indemnification responsibilities

---

174: Research and Experimental Expenditures in the Tax Shelter Context, 4 Journal of Taxation of Investments 19, 26-27 (1986) (§ 1.174-2(b)(8) "necessitates that the research be at the taxpayer's risk and for his reward, the principal attributes of ownership; that is, for the taxpayer to be entitled to the Section 174 deduction when research is performed 'in his behalf,' he must be the owner in substance as well as form. Thus, under a tax shelter R&D contract, the contractor must serve solely as agent of the taxpayer, not sharing in any risks or rewards of successful research.").

[10]The Purchase Option Agreement provides in pertinent part:

7.     Indemnity; Prosecution of Actions
       (a)     The Corporation [Larson-Davis] will promptly give the Partnership [LDL-II] written notice of and defend at the Corporation's sole expense any action or proceeding brought after the Purchase Option Exercise Date by any third party against the Partnership or the Corporation on account of manufacture, production, use or marketing of the Resulting Technology by the Corporation and shall indemnify and save the Partnership harmless against any and all losses, expenses and damages (including reasonable fees of attorneys, accountants and similar advisors) which may be incurred by the Partnership therein or settlement thereof.

Ex. 11-K, at 11-12.

under the Purchase Option Agreement were "not those of a licensee, but of the owner of the ultimate product." Property Growth Co. v. Commissioner, 55 T.C.M. (CCH) 1072 (1988), aff'd, 889 F.2d 1090 (8th Cir. 1989). At trial, LDL-II provided no evidence that there was any market for non-exclusive 14-month licenses to the technology, or that it intended to enter such a market, or that it would be able to do so in and for such a short time frame. Cf. Zink, 929 F.3d 1023 (noting that legal entitlement to go into business retained by taxpayer's licensing technology "nonexclusively" not determinative when "totally lacking in commercial reality."); see also Martyr v. Commissioner, 60 T.C.M. (CCH) 1115 (1990) (holding that where R&D partnership granted researching entity before completion of research 13-month non-exclusive license option and exclusive license option exercisable thereafter, § 174(a)(1) deductions properly disallowed), aff'd, 999 F.2d 543 (9th Cir. 1993); Everett v. Commissioner, 58 T.C.M. 1366 (1990) (same).

In the event Larson-Davis concluded that the results of the research were not marketable, and accordingly chose not to exercise its options, LDL-II would accede to ownership. But in such circumstances, LDL-II would be left with a marginal asset and few prospects for entering a trade or business in connection with the fruits of the research. Where Larson-Davis chose not to exploit the law

of contracts to assume ownership of the completed research, the laws of economics would likely preclude commercial exploitation.

LDL-II claims its expectations of ownership were far broader.[11] It tells us it insisted on retaining ownership of the resultant technology so that had Larson-Davis failed as a commercial enterprise, the partnership would have been able to enter the business of selling 3100 products itself—a proposition that amounts to "putting in good money after the bad."[12] LDL-II has not shown that this retained

---

[11]LDL-II suggests that it might also have acceded to ownership because of the "significant" option purchase price of $6.35 million. However, the Purchase Option Agreement makes clear that this payment was to be made in the form of royalties, and that the transfer in ownership would occur when the option was formally exercised, not when the full "purchase price" had been paid, see Ex. 11-K, at 5, 7-8. Thus, unlike the situation considered by the Ninth Circuit in Scoggins, 46 F.3d at 952, the purchase price in this case represented little barrier to Larson-Davis's assumption of ownership. In Scoggins, a deduction of $500,000 in research expenditures was permitted where the sale price was $5 million, with $1 million to be paid in cash and the remainder by an interest-bearing promissory note. Scoggins, 46 F.3d at 951-52. In the present case, the deductions claimed were for in excess of $1 million and the sale price was $0 up-front, plus specified royalties up to specified total. Cf. Kantor, 998 F.2d at 1517 (disallowing deduction of $3.15 million where sale price was $5,000 up-front, plus specified royalties).

[12]LDL-II intimates that the fourteen-month cross-license option was designed to allow the partnership to exploit other avenues for marketing and manufacturing the 3100 technology should Larson-Davis's sales performance prove disappointing. But LDL-II remained obliged to yield all rights to the technology to Larson-Davis should the latter simply choose to make a higher royalty payment under the terms of the Purchase Option Agreement. Thus, LDL-II would never really have had the opportunity to "pull" Larson-Davis from the marketing and manufacturing ends of the project unless Larson-Davis itself found its sales disappointing and chose to abandon the project. LDL-II nowhere explains why it would try to enter a business with a product whose previous sellers, armed with far greater marketing and manufacturing experience in the field, had concluded it was not commercially viable. See Medical Mobility v. Commissioner, 66 T.C.M. (CCH) 741 (1993) ("Even if the grantor has sufficient resources to bring the product to market, it

interest was based on anything more than the possibility of Larson-Davis's failure. See Kantor, 998 F.2d at 1520; Levin, 832 F.2d at 406-07 (mere legal possibility of entry into trade or business insufficient to satisfy § 174(a)(1)). The partnership's possible succession to an ownership interest it never intended to exploit would not automatically put it in the 3100 trade or business any more than "foreclosing on a real estate mortgage would make a bank a real estate company." Spellman, 845 F.2d at 150. Tom Christopolous, who was an analyst at CFS Properties during 1983-85, stated that "if Larson-Davis couldn't make it," the firm contemplated "prop[ping] up Larson-Davis" and "hiring the existing salespeople and bringing them inside CFS," but admitted that the plans for this "purely hypothetical" contingency were not "real finite." See III R. at 127-29. Moreover, he stressed that plans were limited "because the project, basically, with the exception of the initial period, hit its numbers." Id. at 128-29.

As the tax court noted, the PPM suggests LDL-II intended from the outset that the marketing and manufacturing of the resultant technology be performed by Larson-Davis pursuant to the terms of the Cross-License and Purchase Option agreements. The first documentary evidence of LDL-II's actually evaluating the potential for entering the 3100 business through potential licensees other than

is unlikely that he will do so, in the face of the optionee's appraisal that the project is not commercially viable.").

- 25 -

Larson-Davis dates from 1989, four years after the final deductions were claimed. See Ex. 28-0. Subsequent investigations confirmed the economic difficulties of proceeding with any such operation, and concluded that LDL-II should continue to allow Larson-Davis to market and manufacture the technology for a dwindling royalty return despite Larson-Davis's actual failure to purchase the technology outright. See Ex. 52. These facts support the conclusion that LDL-II had sought to deduct "a capital contribution to a company that was in the business of developing new products," and not "a development expense in connection with its own . . . prospective business." Spellman, 845 F.2d at 150. Such a deduction must be disallowed.

At best, then, the record shows no more than that LDL-II briefly made vague, worst-case plans. Even were we to find clear error in the Tax Court's refusal to credit the oral testimony offered, the partnership has not shown that it ever had an objectively realistic prospect of entering the 3100 business. See Estate of Cook v. Commissioner, T.C.M. (CCH) 1523 (1993) (recognizing that taxpayers' "understanding that contingency plans existed to exploit the research if the license agreement . . . expired or was terminated," insufficient to establish necessary connection to taxpayers' trade or business). Without a far stronger evidentiary showing that the partnership regarded its takeover of the 3100

business as probable, and planned with serious intent for that probability, we cannot conclude that the Tax Court erred in its "realistic prospect" analysis.

### IV

Section 174(a)(1) was expressly intended to encourage businesses to carry out research, and we are sympathetic to the view that "[w]ithout R&D partnerships, many of today's new technologies would still be on the drawing board." Robert L. Wolff, Tax Treatment of Research and Development Limited Partnerships, 32 Prac. Law. 37, 43 (1986). Certainly, "[t]he uncertain contours of 'trade and business' create opportunities for fair debate." Levin, 832 F.2d at 406. Ultimately, however, "[f]air debates about fact-bound matters of characterization are resolved on appeal in favor of the solution the trier of facts reaches." Id. Before making any research expenditures, LDL-II negotiated a set of structured agreements that undermined its proprietary control of the completed research, and leave it now unable to overcome the obvious inference that it contractually assumed the role of an investor. **AFFIRMED**.